# 14-2590-cv

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

»» ««

ANTHONY C. QUARLESS,

*Plaintiff-Appellant,*

*v.*

BROOKLYN BOTANIC GARDENS, CORPORATION, SCOT D. MEDBURY, as President and Chief Executive Officer, ROCHELLE CABINESS, as Director of Human Resources, each being sued individually and in their official capacities as employees of defendant Brooklyn Botanic Garden Corporation,

*Defendants-Appellees,*

*and*

PATRICK CULLINA, as former Vice President of Horticulture and Facilities, FRANK MONTEZ, as former Vice President of Facilities, Planning, Construction and Management,

*Defendants.*

———————————

*On Appeal from the United States District Court for the Eastern District of New York (Brooklyn)*

## BRIEF AND SPECIAL APPENDIX FOR PLAINTIFF-APPELLANT

MICHAEL H. ZHU, P.C.
*Attorneys for Plaintiff-Appellant*
225 Broadway, Suite 307
New York, New York 10007
212-227-2245

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES...........................................i

PRELIMINARY STATEMENT..........................................1

JURISDICTIONAL STATEMENT.......................................2

STATEMENT OF THE ISSUES........................................2

BRIEF STATEMENT OF THE CASE....................................3

STATEMENT OF FACTS.............................................4

      A.    Complaints Made by Mr. Quarless to BBG..............5

      B.    Plaintiff's Termination............................26

      C.    Reduction in Force and Motion for Summary Judgment..28

      D.    Order Appealed From................................29

BRIEF SUMMARY OF ARGUMENT.....................................30

STANDARD OF REVIEW............................................31

DISCUSSION

POINT I

THE DISTRICT COURT ERRONEOUSLY CONCLUDED
THAT PLAINTIFF FAILED TO ESTABLISH A
PRIMA FACIE CASE OF RETALIATION..............................32

      A.    Retaliation Claims: Opposition
           Clause and Participation Clause....................32

      B.    McDonnel Douglas Burden Shifting Analysis..........35

      C.    Adverse Employment Action..........................37

      D.    Protected Activity.................................40

      E.    Knowledge..........................................41

      F.    Causation..........................................43

    1.    Evidence Of Retaliatory Animus.................43

    2.    Close Temporal Proximity.......................47

POINT II

DEFENDANTS' REDUCTION IN FORCE RATIONALE
FOR TERMINATING PLAINTIFF WAS NOTHING BUT A PRETEXT .........50

CONCLUSION..................................................56

FRAP 32[a][7] Certificate of Compliance......................57

Special Appendix............................................58

    Opinion of the Honorable Carol Bagley Amon, USDJ, dated
    June 18, 2014...........................................59

**TABLE OF AUTHORITIES**

**Cases**

Abdu-Brisson v. Delta Air Lines, Inc., 239 F3d 456, 469
    [2d Cir. 2001]........................................ 55
Austin v. Ford Models, Inc., 149 F3d 148, 153 [2d Cir. 1998].. 44
Bernheim v. Litt, 79 F3d 318, 324-26 [2d Cir. 1996]........... 45
Berry v. Stevinson Chevrolet, 74 F3d 980, 984-86
    [10th Cir. 1996]...................................... 43
Brown v. Henderson, 257 F3d 246, 251 [2d Cir. 2001].......... 37
Burlington Indus., Inc. v. Ellerth, 524 US 742, 754-56 [1998]. 38
Byrnie v. Town of Cromwell, 243 F3d 93, 101 [2d Cir. 2001].... 42
Carlton v. Mystic Transp., Inc., 202 F3d 129, 136
    [2d Cir. 2000]........................................ 56
Chambers v. TRM Copy Ctrs. Corp., 43 F3d 29, 37
    [2d Cir. 1994]........................................ 42
Cifra v. Gen. Elec. Co., 252 F3d 205, 216 [2d Cir. 2001]...... 41
Clark Cnty. Sch. Dist. v. Breeden, 532 US 268, 273-74 [2001].. 48
Contes v. Porr, 02 Civ. 5194 [CM], 2004 WL 2699975, at *3
    [SDNY Nov. 16, 2004].................................. 44
Crawford v. Metropolitan Gov't of Nashville &
    Davidson Cnty., Tenn., 555 US 271, 276 [2009]............ 39
Cruz v. Coach Stores, Inc., 202 F3d 560, 566 [2d Cir. 2000]... 36
Danzer v. Norden Sys., Inc., 151 F3d 50, 55 [2d Cir. 1998].... 56
Davis v. State Univ. of New York, 802 F2d 638, 642
    [2d Cir. 1986]........................................ 42
Del Castillo v. Pathmark Stores, 941 FSupp 437, 438 n.1
    [SDNY 1996].......................................... 38
Ezuma v. City Univ. of New York, 665 FSupp2d 116, 123
    [EDNY 2009] aff'd, 367 Fed App'x 178 [2d Cir. 2010]...... 40
Galabya v. New York City Bd. of Educ., 202 F3d 636, 640
    [2d Cir. 2000]........................................ 44
Gilford v. City of New York, 03 Civ. 0091[SHS], 2004
    WL 1574695, at *6 [SDNY Jul. 14, 2004].................. 44
Glover v. S. Carolina Law Enforcement Div., 170 F3d 411,
    413 [4th Cir. 1999]................................... 38
Gordon v. N.Y.C. Bd. of Educ., 232 F3d 111, 117
    [2d Cir. 2000]........................................ 48
Grant v. Hazelett Strip-Casting Corp., 880 F2d 1564,
    1569 [2d Cir. 1989]................................... 42
Holcomb v. Iona Coll., 521 F3d 130, 138 [2d Cir. 2008]........ 57
Housing Works, Inc. v. City of New York, 72 FSupp2d 402,
    424 [SDNY 1999]...................................... 54
Howley v. Town of Stratford, 217 F3d 141, 150 [2d Cir. 2000].. 42
Hubbard v. Total Communications, Inc., 347 FedAppx 679, 681

[2d Cir. 2009]..................................... 39, 46

Iannone v. Frederic R. Harris, Inc., 941 FSupp 403
    [SDNY 1996]............................................. 42

Ideal Steel Supply Corp. v. Anza, 652 F3d 310, 326
    [2d Cir. 2011]............................................ 57

Johnson v. IAC/Interactive Corp., 2 FSupp2d 504 [SDNY 2014]... 57

Jute v. Hamilton Sundstrand Corp., 420 F3d 166, 173
    [2d Cir. 2005]............................................ 41

Kinsella v. Rumsfeld, 320 F3d 309, 314 [2d Cir. 2003]........ 55

Knox v. Indiana, 93 F3d 1327, 1334 [7th Cir. 1996]............ 43

Leiberman v. Reisman, 857 F2d 896, 900 [2d Cir. 1988]........ 44

Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842
    F2d 590, 593 [2d Cir. 1988].............................. 39, 47

Maresco v. Evans Chemetics, 964 F2d 106, 110 [2d Cir. 1992]... 37

McDonnell Douglas Com. v. Green, 411 US 792, 802-05 [1973].... 40

McKenzie v. Renberg's, Inc., 94 F3d 1478, 1486-87
    [10th Cir. 1996].......................................... 40

Meiri v. Dacon, 759 F.2d 989, 995 (2d Cir. 1985).............. 60

Morris v. Lindau, 196 F3d 102, 110 [2d Cir. 1999]........ 44, 45

Passer v. American Chem. Soc'y, 935 F2d 322, 331
    [DC Cir. 1991]............................................ 43

Preda v. Nissho Iwai Am. Corp., 128 F3d 789, 791
    [2d Cir. 1997]............................................ 45

Quinn v. Green Tree Credit Corp., 159 F3d 759, 768
    [2d Cir. 1998]............................................ 38

Richardson v. New York State Dep't of Correctional Servs.,
    180 F3d 426, 444 [2d Cir. 1999].......................... 42

Rigodon v. Deutsche Bank Sec., Inc., 04 Civ. 2548[GEL],
    2004 WL 2471859, at *3 [SDNY Nov. 1, 2004]............... 44

Sanders v. New York City Human Resources Admin., 361 F3d 749,
    755 [2d Cir. 2004]................................... 44, 45

Sumner v. United States Postal Serv., 899 F2d 203, 209
    [2d Cir. 1990]............................... 36, 39, 41, 54

Tenenbaum v. Williams, 193 F3d 581, 593 [2d Cir. 1999],
    cert. denied sub nom, City of New York v. Tenenbaum,
    529 US 1098 [2000]....................................... 37

Tepperwien v. Entergy Nuclear Operations, Inc., 663 F3d 556
    n.6 [2d Cir. 2011]........................................ 41

Terry v. Ashcroft, 336 F3d 128, 140-41 [2d Cir. 2003]..... 49, 53

Townsend v. Benjamin Enterprises, Inc., 679 F3d 41
    [2d Cir. 2012]............................................ 38

Treglia v. Town of Manlius, 313 F3d 713, 713, 719
    [2d Cir. 2002]............................... 42, 44, 45, 53

Vergara v. Bentsen, 868 FSupp 581, 592 [SDNY 1994]........... 42


Walerstein v. RadioShack Corp., No. 04-CV-1096, 2007
    WL 1041668, at *7 [EDNY Mar. 30, 2007].................. 56

Wideman v. Wal-Mart Stores, Inc., 141 F3d 1453, 1456
    [11th Cir. 1998]........................................ 43
Wyatt v. City of Boston, 35 F3d 13, 15-16 [1st Cir. 1994]..... 43
Yartzoff v. Thomas, 809 F2d 1371, 1375 [9th Cir. 1987]........ 43
Yerdon v. Henry, 91 F3d 370 [2d Cir. 1996].................... 43
Zann Kwan v. Andalex Grp. L.L.C., 737 F3d 834, 846–47
    [2d Cir. 2013]...................................... 35, 55
Zimmermann v. Associates First Capital Corp., 251 F3d 376,
    381 [2d Cir. 2001]..................................... 42

**Statutes**

28 USC §1291.................................................. 7
42 USC §1981.................................................. 8
42 USC §2000-e et sec......................................... 8
42 USC §2000e-3[a]........................................... 38
N.Y. Exec. Law §296....................................... 8, 38

**Other Authorities**

Restatement [2d] of Agency § 219[1].......................... 38

**Rules**

N.Y. City Admin. Code §8-107.............................. 8, 38

UNITED STATES COURT OF APPEALS
SECOND CIRCUIT
-----------------------------------------X Docket No.
ANTHONY C. QUARLESS,                                2014-2590

                    Plaintiff-Appellant,

    -against-                                   **APPELLANT'S**
                                                **BRIEF**

BROOKLYN BOTANIC GARDEN CORP., SCOT
D. MEDBURY, as President and Chief
Executive Officer; and ROCHELLE
CABINESS, as Director of Human
Resources, each being sued
Individually and in their official
Capacities as employees of defendant
BROOKLYN BOTANIC GARDEN CORP.,

                    Defendants-Respondents.
-----------------------------------------X

### PRELIMINARY STATEMENT

    This brief is submitted by plaintiff-appellant Anthony

Quarless in support of his appeal [367[1]] from a Memorandum and

Order, dated June 18, 2014 [346-365] and Judgment dated June 19,

2014 [366], of the United States District Court for the Eastern

District of New York [Carol Bagley Amon, USDJ], which granted

the motion for summary judgment and dismissal of the complaint

by defendants-appellees Brooklyn Botanic Garden Corp., et al

[collectively referred to herein as "BBG"], on the grounds that

plaintiff could not establish a prima facie claim of retaliation

under Title VII and §1981.

_____

[1] Numerical references in parenthesis are to the pages of the joint appendix.

1

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over the appeal pursuant to 28 USC §1291. The Judgment appealed from was entered in the Clerk's Office on June 19, 2014. The Notice of Appeal was timely filed on July 15, 2014. This appeal is from a Final Judgment that disposed of all of the claims with respect to all parties[2].

## STATEMENT OF THE ISSUES

1. Whether the district court erred in holding that the defendants met their initial burden on summary judgment by establishing with admissible evidence, their entitlement to judgment as a matter of law.

2. Whether the district court erred in holding that defendants' decision to terminate plaintiff was not based on a pretext for retaliation.

3. Whether the district court erred in granting summary judgment to defendants by improperly assessing the credibility of witnesses and weighing the evidence in favor of the defendants.

_____

[2] Prior to the District Court's decision, plaintiff voluntarily withdrew all claims against defendants Patrick Cullina and Frank Montes, as well as all claims of race discrimination and hostile work environment against defendants' BBG, Scot D. Medbury and Ms. Cabiness [345]; the only remaining claim is retaliation for making informal and formal complaints of discrimination.

We believe that the answer to each of these issues is "Yes" and the order and judgment appealed from should be reversed and the case remanded back to the District Court for an immediate trial.

## BRIEF STATEMENT OF THE CASE

Plaintiff Anthony Quarless commenced this action against defendants pursuant to Title VII of the Civil Rights Act of 1964, 42 USC §2000-e et sec, 42 USC §1981, the New York State Human Rights Law ["NYSHRL"], N.Y. Exec. Law §296, and the New York City Human Rights Law ["NYCHRL"], N.Y. City Admin. Code §8-107.

Mr. Quarless alleged that as the Director of Security for BBG, he suffered numerous adverse employment actions in retaliation for complaining to BBG's Director of Human Resources, Rochelle Cabiness on numerous occasions about race discrimination and sexual harassment at work suffered by him and others, and for filing a complaint and several supplemental filings, with the EEOC concerning these discriminatory work-related issues.

These adverse employment actions include a withholding of merit based salary increases, negative performance reviews, denial of opportunities to attend professional conferences, loss of his ability to carry a firearm, setting him up for failure by

3

deliberately reducing the Security Department's budget, and termination in July 2010, after 28 years of dedicated and loyal service.

Briefly, Mr. Quarless complained to Ms. Cabiness and the EEOC that he was the subject of retaliation because he recommended the promotion of an African-American co-worker to be his assistant, when senior management and human resources attempted to intimidate him into hiring an unknown white applicant from outside the institution. Mr. Quarless was also retaliated when African-American and Hispanic members of his staff complained about discrimination and disparate treatment. As a result of these complaints, plaintiff received poor performance evaluations, which resulted in the withholding of merit based salary raises. In addition, Mr. Quarless witnessed threats of retaliation by management against his staff for complaining and was retaliated against for recommending management to correct the discriminatory practices. The plaintiff was also threatened on several occasions for speaking out to senior management about the systematic discriminatory practices.

## STATEMENT OF FACTS

Mr. Quarless, an African-American male, began working at BBG in or around June 1982 as a seasonal guard. Over the course

4

of his 28 year employment, he was promoted on four occasions, culminating in his promotion in 2000 to Director of Security, a position he held until his termination in July 2010. [15]

## A.    **Complaints Made by Mr. Quarless to BBG**

Mr. Quarless asserted that over his 28-year career at BBG, he repeatedly complained to BBG management, Ms. Cabiness, and ultimately the EEOC about race and gender discrimination and sexual harassment that he experienced or witnessed at BBG. These complaints were documented in emails sent at work to Ms. Cabiness and in a complaint he filed with EEOC on October 28, 2009. [230-254]

In his verified complaint, Mr. Quarless alleged that in June 2004, a white female named Anne O'Neil completely fabricated a story of harassment and made a complaint against plaintiff to his immediate supervisor Keith Stubblefield, Chief Financial Officer & vice President of Finance.  Ms. O'Neil stated that plaintiff screamed at her and used profanity. However, after an investigation, Ms. O'Neil admitted that she lied about the entire incident; however, Ms. O'Neil was never reprimanded for making a false report and Mr. Quarless never received an apology as he had demanded from management. [16]

Plaintiff complained that the failure of BBG's senior management and Ms. Cabiness to follow its own policy and take

some form of disciplinary action against Ms. O'Neil for committing a very serious offense, established a culture within the organization that suggested it was ok to file false complaints and disrespect the Director of Security because no one would be held accountable. [231]

Two years later, in March 2006, Lou Provost [white male] a foreman in the Horticulture Department violated defendant BBG's policy by removing personal items from a locker belonging to Security Supervisor Niurka Arias [Hispanic female], then throwing her personal belongings, including her underwear, on the floor for all to see. [16-17]

Mr. Quarless complained to Ms. Cabiness about this insensitive treatment; the complaint was ignored and nothing was done. [17]

In May 2006, Richard Faraino, a white per-diem intern working in the Horticulture Department, was confronted by Mr. Quarless for walking into the building without displaying his ID, which was a violation of BBG's policy. Mr. Faraino ignored plaintiff and walked away. Mr. Quarless complained about Mr. Faraino's behavior to Jackie Fazio [white female], Director of Horticulture; Mr. Faraino was never disciplined. [17, 233]

Shortly thereafter, in July 2006, Vladmir Strelnikov [white male], an intern working in the Education Department, along with

two friends, were caught by Security Officer Rafael Carrion [Hispanic male] stealing coins out of BBG's fountain. The police were called and the three perpetrators were about to be arrested when Marilyn Smith [white female], Director of Education intervened by protesting the arrest. Mr. Stubblefield was made aware of the situation and told Mr. Quarless that Mr. Strelnikov would be terminated but that he too did not want the intern to be arrested. Mr. Stubblefield lied about this because the intern was only suspended and never terminated. [17-18, 19, 233-234] Mr. Quarless complained to Ms. Cabiness "about the deceit, dishonesty and discrimination". Ms. Cabiness said she was not aware of the incident but would get back to plaintiff. She never did. [18, 235]

This incident and BBG's response was in sharp contrast to a similar incident that occurred about a year before in 2005, involving an African-American male. Mr. Karieth Engram, an employee of BBG, was observed on surveillance video stealing money from the Gift Shop. Mr. Quarless was instructed by BBG management to not only terminate Mr. Engram, but to have him arrested and marched through the lobby in handcuffs to "send a message". [18, 235]

In July 2006, Mr. Quarless and Glenn Curtis, Senior Supervisor of Security, witnessed an incident where Security

Supervisor Ms. Arias was sexually harassed by a guest of an employee at an annual staff picnic. When Mr. Quarless reported the issue to Ms. Cabiness, her response was "is that it? I thought you were going to tell me something broke again". Ms. Cabiness never investigated or responded to the sexual harassment complaint. [18, 235]

In August 2006, Mr. Quarless sent Ms. Cabiness an email documenting the "systematic discriminatory practices" at BBG; Mr. Quarless also expressed his frustration "at the continuous lack of respect" for Mr. Quarless as a black male and head of security. [19, 236]

Mr. Quarless met with Mr. Stubblefield in their weekly meeting and discussed the email; Ms. Cabiness was called and asked to join the meeting. Ms. Cabiness stated that "As a Black woman I am offended by what you wrote in the e-mail", and berated Mr. Quarless for making complaints about discrimination and harassment in the workplace. Indeed, Ms. Cabiness further stated "Let me tell you something. It is one thing to come by my office and talk about this stuff but, when you have the nerve to send it to me via e-mail that is a totally different story." Plaintiff responded "I simply brought something to your attention that was factual regarding all of the past incidents

that are discriminatory. I cannot believe that you attacked me for bringing this to your attention." [19, 236]

Several weeks later, in September 2006, Mr. Quarless requested permission from Mr. Stubblefield to attend a training conference conducted by the American Society for Industrial Security, of which Mr. Quarless had been a member for more than 12 years. The request was flatly denied without explanation. Mr. Quarless felt that the refusal was retaliatory because in the past, whenever white directors sought approval to attend professional conferences, their requests were approved[3]. [20, 238]

That same month, Mr. Stubblefield told Mr. Quarless that BBG was going to hire an Assistant Director of Security; the move was necessary because of "problems" in the security department. Mr. Quarless asked for an explanation because he did not feel that there were "problems" in his department and he already had an assistant – Mr. Glenn Curtis. Mr. Stubblefield replied that "Glenn is the problem" and that plaintiff should be happy that he was going to get an assistant "and it will be anyone but Glenn". [238]

---

[3] A similar request to Mr. Stubblefield's eventual replacement in February 2007 was also denied. [241]

Mr. Quarless was asked to draft a job description for the Assistant Director position; Mr. Quarless prepared one based on the duties and responsibilities that Mr. Glenn currently carried out. [238]

Next month, in October 2006, Mr. Stubblefield informed plaintiff that he was resigning and warned him to stop complaining about Ms. Cabiness because he will "regret it"; and "she could cause a lot of problems" if plaintiff continued to make complaints. [20, 238]

Mr. Quarless then had a discussion about the Assistant Director's position with the interim CFO, Ms. Patricia Coderre; she first recommended that a physical requirement be put in so as to exclude Mr. Curtis from qualifying for the position[4]. Then Ms. Coderre suggested an academic requirement of "some college" be put in for the position; this was consistent with the academic requirement for Mr. Quarless's position of "College Degree". A couple of days later when the ad appeared in the New York Times classifieds, Mr. Quarless noted that the position required a "Bachelor's Degree". This effectively removed Mr. Curtis, an African-American from consideration. When Mr. Quarless asked Ms. Coderre about the change, she responded that

---

[4] Mr. Curtis was obese and overweight and would not have met the physical requirement. [239]

she did not need plaintiff's permission "to do anything but indicated that it was Ms. Cabiness's idea." [20-21, 239]

In January 2007, after interviews of potential candidates were conducted, Ms. Cabiness expressed to Mr. Quarless how she was impressed with James C. Orlando, a white candidate. Ms. Cabiness then asked Mr. Quarless who he liked the most; Mr. Quarless told her he liked Mr. Curtis because he was currently doing the job and in fact Mr. Quarless created the job description for the position after summarizing Mr. Curtis's duties and responsibilities. [21, 239-240]

Ms. Coderre had a similar conversation with Mr. Quarless; when Mr. Quarless told her that he liked Mr. Curtis, she became angry and asked plaintiff why he was "playing games" when "you know we don't want him!" Ms. Coderre further revealed that a decision was made in advance of the hiring process to pass over Mr. Curtis for the promotion because he "was a problem". When Mr. Quarless responded that Mr. Curtis had not been a problem, she became very upset and promptly asked plaintiff to leave her office. [21-22, 240]

Soon thereafter plaintiff began to notice some of his timecards were missing when he asked to review his timecards for July-December 2006. After reviewing the original timecards, Mr. Quarless noticed that whiteout was used to alter some of the

data; hours that Mr. Quarless worked were missing or changed. For example, vacation time was replaced with holiday time. "Unbeknownst to me, they were altering my time cards and stealing my time". [22-23, 240, 242]

At the request of Ms. Cabiness, Mr. Quarless met with Scot Medbury, the CEO of BBG in February, 2007 to discuss the Assistant Director position; Mr. Medbury asked Mr. Quarless who he liked and plaintiff said Mr. Curtis. Mr. Medbury said they wanted a "fresh set of eyes" and that he liked Mr. Orlando. Mr. Quarless told Mr. Medbury that he respected his opinion, but "if this is going to be my assistant, I would rather go with who I know, who I have worked together with for 10 years, who I am comfortable with, and who is already trained and doing the job." [22, 241]

Mr. Medbury said "very well" and proceeded to ask Mr. Quarless about the firearm that he carried everyday on the job. Mr. Quarless told Mr. Medbury that he was fully qualified and licensed to carry a firearm and that it was one of the requirements of Director of Security for at least 24 years, ever since BBG created the position. Mr. Medbury said that he did not want plaintiff to carry a gun on this job anymore and that he will ask Ms. Cabiness to amend the job description and remove that requirement. [22-23, 241]

Mr. Medbury then questioned plaintiff's training, ability, discretion, and the need to carry a weapon. Mr. Quarless replied that his license and training were approved by the New York State Department of State, the New York State Division of Criminal Justice Services, and the New York City Police Department. Mr. Medbury said "well I do not want you carrying a gun on this job anymore." [23, 241]

After the meeting plaintiff sent Mr. Medbury an e-mail informing him that he should be allowed to keep his firearm because his life had been threatened by a man plaintiff had captured stealing an employee's property in August 2006. Mr. Medbury said he was unaware of that incident but indicated that he was not going to change his decision. [241]

In May 2007 Mr. Quarless requested permission to attend an annual training conference conducted by the National Organization for Black Law Enforcement Executives, of which he was a member for 12 years; the request was completely ignored by Mr. Patrick Cullina, BBG's new Vice President. [23, 243]

Mr. Quarless also asked Mr. Cullina on several occasions about his annual salary increases; despite promising to get back to plaintiff about it, Mr. Cullina never responded. However, Mr. Cullina processed a salary increase for Rudy Rudolff [white male], during that same timeframe. Plaintiff complained to Ms.

Cabiness in July 2007 about the unfair treatment, but his complaint fell on deaf ears. [24, 242-243]

Another instance of disparate treatment that Mr. Quarless complained about involved BBG's policy of reporting accidents. One time, Mr. Raymond Lett a black male security supervisor, was involved in an accident while operating a BBG owned motor vehicle. As part of BBG protocol, he filed an accident report. Mr. Quarless was directed by Mr. Stubblefield that Mr. Lett had to be disciplined for the accident and brought up on charges of negligence. Thereafter, Mr. Lett was disciplined for having the accident. [24, 243]

In contrast, Mr. Quarless learned in July 2007 that Monica Hannemann, a white female employee in the Education Department had an accident with a BBG vehicle. Mr. Quarless went to retrieve his camera to take photos of the damage and found out that it was already in the maintenance garage, already repaired. Mr. Quarless asked Mr. Cullina about it and told him that no accident report was filed by Ms. Hannemann; he told Mr. Quarless that he would "look into it" but a report was never filed and the employee was not disciplined. [24, 243]

In September 2007 Mr. Cullina was caught on surveillance threatening one of his employees; a black male employee named Joseph Wicker. Mr. Wicker filed a formal complaint against Mr.

14

Cullina with both the union and Human Resources. Mr. Quarless assisted in the investigation of the complaint and provided a report to Ms. Cabiness, indicating that based on the video, Mr. Cullina engaged in physically inappropriate behavior towards Mr. Wicker. [24-25, 244]

In October 2007 Mr. Quarless complained to Ms. Cabiness about budget cuts made to the security department, while salary increases were approved for per-diem employees; plaintiff told Ms. Cabiness that Mr. Cullina was "trying to set me up to fail". [244]

> I expressed great concern over my budget and I did not want Patrick to give me a poor evaluation for failing to properly manage my department's budget. I told Rochelle that I was certain to be over budget at the end of the fiscal year and I did not want to be blamed for it. She told me that Patrick Cullina could not hold the budget against me because it was not something that would go into an evaluation.

[244] Mr. Quarless's fears were confirmed when Mr. Cullina eventually gave him a poor performance review and claim that he had difficulty managing a budget. [245]

BBG's security staff complained to plaintiff in October 2007 about having to work 8 ½ hours a day [including ½ hour lunch] while everyone else at BBG worked only 8 hours [including a ½ hour lunch]. Mr. Quarless brought these concerns to Ms. Cabiness and Mr. Cullina. "The staffs concerns were never addressed." Indeed, Ms. Cabiness said that plaintiff did not

15

have the authority to change the situation and Mr. Cullina simply said "no". [25-26, 245]

Nor was this all. Mr. Cullina then used plaintiff's employee evaluation to criticize his leadership skills citing the staff complaints to the union as the basis. [245]

Mr. Cullina finally sat down and met with Mr. Quarless and Mr. Curtis to discuss the issues regarding overtime pay in the security department. During that conversation Mr. Cullina acknowledged that there was disparate treatment and that BBG was in violation of the union contract but that the situation could not be corrected, because to do so would be an admission of guilt, the Garden may be sued, and he would not allow that to happen. Mr. Quarless was told to keep quiet and not to say anything, "and if the staff continue[ed] to complain, all of us including myself will be blamed". [26, 247]

In November 2007, plaintiff forwarded an incident report and complaint of workplace violence to Ms. Cabiness after an employee named Allen Peters threatened Ms. Arias' life; Mr. Peters mistakenly believed that Ms. Arias had filed a report against him for improperly parking his personal vehicle on BBG's grounds, after plaintiff asked Mr. Peters to remove his vehicle. When plaintiff asked Mr. Peters to move his car he became extremely angry and started cursing and threatening Ms. Arias

believing that she was the one who reported him. Plaintiff reported the threats to Mr. Cullina and Ms. Cabiness, however it was never addressed; no disciplinary action was taken against Mr. Peters and more importantly, the threat itself was never addressed. Ms. Cabiness claimed to have investigated the incident but when Mr. Quarless interviewed a key witness, Security Officer Adrian Murray who was present when Mr. Peters made the threat, he indicated that he was never interviewed by Ms. Cabiness. [246]

Even more incredibly, in response to this incident, Mr. Quarless was reprimanded by Mr. Cullina because Mr. Peters complained that he felt threatened and intimidated by plaintiff. [246]

In December 2007, Mr. Quarless met with Mr. Cullina to discuss the ongoing discriminatory treatment; Mr. Cullina became angry and remarked that he was "tired of all the discrimination complaints"; he also asked Mr. Quarless for examples of how he was treating plaintiff differently. Mr. Quarless reminded Mr. Cullina about the raise that he should gave gotten when he approved Rudy Rudloff's raise. Mr. Cullina's response was that there was nothing that stated that Mr. Quarless had to be given a raise. However, this was not true given that plaintiff was the only one not to have received a raise. [26, 247]

According to BBG's new employment evaluation and salary policy, Mr. Quarless was supposed to have received a review and been eligible for a salary increase in 2007. Thus, Mr. Cullina's refusal to evaluate the plaintiff's performance and salary increase, constituted a violation of BBG's revised policy and was evidence of retaliatory animus. [247]

In March 2008, Mr. Cullina met with Mr. Quarless to discuss his employment evaluation and review. Mr. Quarless was presented with a new evaluation form that contained a summary of Mr. Cullina's assessment of plaintiff's performance, however there was no space for Mr. Quarless to comment or rebut the remarks. Mr. Quarless complained that the evaluation was one-sided if it did not provide him with an opportunity to respond. Mr. Cullina stated that it was okay for plaintiff to disagree but he could do that later; he wanted Mr. Quarless to sign off on the evaluation first. When Mr. Quarless refused, Mr. Cullina became angry and left. Mr. Quarless also noted that there was no overall rating or grade; a rating was necessary to determine eligibility for merit raises and bonuses. When Mr. Quarless asked Mr. Cullina about the lack of a performance rating, he replied that "you don't really want me to do that because if I place a rating on it, you will receive a 'less than meets expectation' rating." [248]

With respect to the Security Department's budget, in March 2008, Mr. Quarless met with Mr. Bing Su, BBG's Comptroller and asked for a copy of the Security Department's budgets for the past five years. Mr. Bing started to laugh as he passed the documents to Mr. Quarless; he stated that he had never seen anything like this before; the security budget was cut in each of the last three years while overall spending for the Garden had moderately increased each year. [26, 248]

That same month, Mr. Quarless met with Barbara Logan, CFO to discuss the Security Department budget. Mr. Quarless expressed to Ms. Logan that he was extremely concerned and baffled by the decision to cut the budget by a whopping 40% especially when in 2006-2007 spending had exceeded the previous year's budget. Ms. Logan stated that she could not understand that either but she was instructed by Mr. Cullina to do so. Ms. Logan then confided that when she arrived at the Garden in April 2007, she was immediately placed in a position of having to finalize the upcoming budget and did not have a full understanding of the various department expenditures. She said that when Mr. Cullina came to her and told her to cut the Security Department's budget, she assumed that he knew what he was doing and she did not know any better at the time because she was new.

Ms. Logan went on to say that she was upset that the Security Department blew through its budget because as the CFO it made her look incompetent in the eyes of the Board of Trustees. Ms. Logan said, referring to Mr. Cullina, "He could fool me once, but he will not fool me twice."

Ms. Logan then informed Mr. Quarless that she was restoring the budget to what it had been prior to Mr. Cullina's instructions and in fact she was increasing it a little. [27, 248]

In May 2008, Mr. Quarless was promised a salary increase upon his completion of a Master's Degree; he never received a raise even though he obtained his Master's Degree. [27, 249]

Mr. Quarless finally met with Ms. Cabiness regarding his evaluation and review in August 2008 after Mr. Cullina told plaintiff that he wanted nothing more to do with the review process. Ms. Cabiness informed plaintiff that Mr. Cullina finally placed a rating on the evaluation, but only after he was directed to do so by BBG's CEO, Mr. Medbury. [27]

The following is excerpted from Mr. Quarless's EEOC complaint regarding this meeting:

> I went over the evaluation and I told Ms. Cabiness how disappointed I was with the institution and all the dishonesty, deceit and lack of professionalism. I asked Ms. Cabiness how was it possible for Mr. Cullina to write an evaluation about me that contained blatant lies, some of which Ms. Cabiness herself could attest

to. Besides setting me up to fail with the budget, Mr. Cullina indicated that I had failed to do certain things which Ms. Cabiness knew was not true because I had given her copies of documents that I provided Mr. Cullina and for which he said I never created. Ms. Cabiness had no reply. I asked her how someone could blatantly tell lies like that on their subordinate employee's evaluation and where is Mr. Cullina's accountability. Ms. Cabiness stated that was Mr. Cullina's opinion of me and he was entitled to it. I told Ms. Cabiness that the evaluation went beyond the scope of opinion and contained deliberately false information that she knew to be untrue. I asked Ms. Cabiness who, if anyone, evaluated the evaluations? She offered no explanation. I then asked her what my salary increase was going to be. Ms. Cabiness stated that I had received a "Meets expectations" rating and so I could expect a 3% increase. I asked her if that was going to be retroactive to April 2006 and she said she did not think so. I asked her what the increase for the period of April 2006 to February 2007 was going to be and she said she did not know. Ms. Cabiness was also not telling the truth and in fact was lying to my face. Unbeknownst to me, the salary increase had already been processed and was included in a paycheck I would receive that same day. I received a 2.2% increase. I do not know why Ms. Cabiness chose to lie to me about this matter, but the blatant dishonesty and lack of integrity is very disturbing.

[249-250]

In January 2009, Mr. Quarless was confronted by Mr. Kimtroy Henry, a BBG custodian who demanded to know why one of his co-workers had been terminated. Even though Mr. Quarless told Mr. Henry repeatedly that it did not concern him, Mr. Henry continued to badger and follow Mr. Quarless around, demanding an explanation. Eventually Mr. Henry walked away in an angry state. Mr. Quarless spoke to Mr. Henry's supervisor, Nicola

21

Pallante, who was also present, and expressed his dissatisfaction with Mr. Henry's unprofessionalism, contempt and lack of respect. Two days later, Mr. Quarless was advised that Mr. Henry had filed a complaint in which he accused plaintiff of threatening him and using profanity. Mr. Quarless denied these accusations. Nevertheless, Mr. Quarless was reprimanded by Mr. Frank Montes and received a negative evaluation as a result of this incident. [28, 250]

In April 2009, Mr. Quarless met with Mr. Montes for his annual review; it was very similar to the review plaintiff received from Mr. Cullina the year before. In support of the poor review, Mr. Montes cited the letter written by the security staff in 2007 complaining of disparate treatment in having to work an extra ½ hour and not getting paid overtime. Mr. Quarless thought that it was unfair to pin this on him because the union members had a right to complain about the unfair employment practices; Mr. Montes's response was that the complaint reflected poorly on Mr. Quarless's leadership skills; the complaints from the staff were ongoing and plaintiff would be "held accountable for it". [28, 251]

Clearly, this negative performance evaluation given by Mr. Montes was retaliatory because Mr. Quarless supported the

security staff's complaints about disparate treatment (the staff is made up entirely of minority workers).

In April 2009, Mr. Quarless learned that one of his hiring slots was taken away from him without his knowledge or consent; it was used by Ms. Cabiness to approve the hiring of another white worker in the Education Department. [28, 251]

Plaintiff's assistant director, Mr. Curtis forwarded a sexual harassment complaint made by Ms. Arias against Mr. Henry in May 2009, alleging that she was physically assaulted by Mr. Henry; video surveillance recordings support her allegations. Mr. Cabiness was made aware of the situation but did not promptly investigate the matter and did not even meet with the complainant until more than a week later, and only after prompting from Mr. Quarless. [28, 251]

Soon after Mr. Quarless filed his complaint with the EEOC in May 2009, he discovered that someone had tampered with his email account stored on his computer in his office; all of his emails in 2007 were deleted. Then in October 2009 Mr. Quarless noticed that certain computer files were mysteriously deleted from his computer; the files contained parts of investigations he conducted at BBG regarding the claimed instances of race discrimination and sexual harassment. [251]

In his written complaint to the EEOC dated October 28, 2009, Mr. Quarless summarized that:

> The Brooklyn Botanic Garden has and continues to retaliate against me and at the same time place my life in danger. The job description that I was hired under which had been in place for 24 years prior to me taking the position was revised so that it could support the retaliation. My firearm was stripped from me after my life was threatened by a career criminal that I caught stealing property from the Garden while in the process of carrying out my duties and responsibilities. As a manager, I do not get involved in union matters. However, I am very disturbed none the less by the way my own staff is treated by the Garden's senior management and human resources and what appears to be either a lack of competent union representation or something else causing their officials to side with the management. I have tried to fix many of these problems by pleading with Rochelle and senior management to correct some of the very valid concerns fluid issues raised by the staff, only to be targeted and retaliated against for not siding with the management and assisting them with the violations and wrongdoing.
>
> I have also witnessed discrimination against members of my staff. The entire security department is unhappy about the current working conditions at the Brooklyn Botanic Garden. When they complained to their union about some of the conditions including working a ½ hour longer day than any other department or staff at the Garden and not being compensated, the union approached Patrick Cullina and Rochelle Cabiness about the problem. In a meeting to discuss various issues, with several union representatives present along with Patrick Cullina, Rochelle Cabiness, Glenn Curtis and I, Mr. Cullina openly threatened the staff with retaliation stating; "If they [the day shift security workers] keep complaining about working 8 ½ hours a day, I will make all of them [the entire security staff; day, evening and midnight] work 8 ½ hours. I was shocked at Mr. CulIina's blatant arrogance and violation of the law. More importantly, I was just as shocked at the union's response. The union, rather than challenge Mr. Cullina for his threats,

immediately backed down and pleaded with him not to do it.

The Brooklyn Botanic Garden regularly discriminates against African-American and Hispanic employees and immediately retaliates against any employee that complains. When I have complained about various systematic discriminatory practices I have been retaliated against with numerous adverse actions including one that endangered my life after I was the recipient of verified death threats acquired by carrying out my duties. The Garden retaliated against me when I refused to participate in an unlawful act in which they wanted to hire a White male [from outside the institution] over the Black male incumbent that was already fulfilling the duties of the position. When I refused to comply with their wishes but instead indicated that the incumbent deserved the promotion, they retaliated against me immediately with no regard for my personal safety. They refuse to pay me equally based upon my qualifications, the level of my education, and length of service to the institution. I receive approximately $20,000 less than my colleagues, some of which are not held to the same standards that I am.

I do not think it is possible any longer for me to receive a fair and accurate evaluation from any senior manager any longer. Prior to the evaluation Patrick Cullina gave me in 2008, I had never received a less than "Exceeds expectations" rating. I had also never received less than a 4% increase in any salary increase that was given to me. Patrick Cullina was allowed to write an evaluation that contained numerous lies. Rochelle Cabiness, despite being aware of several of the false negative statements contained in my evaluation, never questioned any of them. I complained to Ms. Cabiness, pleading with her to do something, but as is typical of her, she chose to assist Mr. Cullina with his fraudulence rather than challenge and address the dishonesty. The lack of respect, the lack of administrative support, the lack of human resources assistance, and the lack of integrity which has become part of the organization's culture, makes it extremely difficult for me to do my job.

I allege I have been discriminated against due to my race/color and subjected to retaliation under the

25

Civil Rights Act of 1964 [Title VII], as amended when I was unfairly treated in the workplace. The discrimination and retaliation is ongoing.

[252-253]

Thereafter in January 2010, plaintiff complained to Ms. Cabiness that Mr. Curtis was being paid below the advertised rate of pay since March 2007, and that Mr. Curtis was the only manager at his level without an office or personal workspace. [29, 256-257]

On March 2, 2010 Mr. Quarless met with the EEOC and followed up with a letter dated April 20, 2010 attaching a copy of the letter written by the Security Staff to its union complaining of having to work an extra ½ hour a day without compensation. [259] This was the letter that Mr. Montes claimed warranted a negative performance review.

## B. **Plaintiff's Termination**

Thereafter, on July 13, 2010 Mr. Quarless was terminated by Richard Coleman, BBG's Vice President of Facilities, Planning, Construction and Management and Mark Gasparini, Vice President and CFO. [29]

Specifically, Mr. Quarless detailed the events that day leading to his termination:

On Tuesday July 13, 2010 at approximately 1:45 p.m., I was in my office working when I was visited by two members of senior management; my immediate supervisor Richard Coleman, VP of Facilities, Planning,

26

Construction and Management and Mark Gasparini, VP & CFO. They entered my office, closed the door, and sat down. Mr. Coleman then began reading from a prepared statement informing me that I was being terminated. He then instructed me to hand over my ID badge and keys at which point I complied. I stood up from my desk and handed him the items before sitting back down. He then handed me my final pay statement and Metropolitan Transit Authority Metrocard and asked me to sign for both of them at which point I complied. I placed both items on the desk and then Mr. Coleman handed me a large white envelope. Mr. Gasparini stated that the envelope contained a Severance Agreement and that I should take it home and read it. At that point Mr. Coleman ordered me to vacate the Brooklyn Botanic Garden property immediately. I looked at him and then while looking around the room I informed him that I had numerous personal items in the office which I needed to take with me. The personal items included family photographs, valuable mementos, gifts from my children, other valuable gifts, my college degree, awards, plaques, money and clothing, etc. I stated to Mr. Coleman that I would need some time to collect my things, and he said no! I stated that I did not want to leave my personal property behind. I said to him that all of my personal things belonged to me and I wanted to take them with me. I told him that I did not want to leave them behind. Once again Mr. Coleman said no! He stated that I should call them within the next couple days and make an appointment to retrieve my property but that I needed to vacate the property immediately! I said to Mr. Coleman and Mr. Gasparini, "After 28 years of service, this is what it comes down to? This is how it ends?" Mr. Coleman said yes and then reiterated what he said previously and once again ordered me to leave the property immediately. I got up from my desk and began to exit the office at which point Mr. Coleman pointed to my desk and told me to take the pay statement and Metrocard. I asked him why? He stated, "Because I want you to." I stated to him that there was no need for me to do that especially if I had to return at a later date to retrieve all the rest of my personal items. I told him that I would take those two items when I return to take everything else that belongs to me. My response angered Mr. Coleman. He then became very confrontational and

ordered me to take the two items. I refused, citing that it didn't make any sense to take two items that I had no immediate use for and at the same time I was being forced to leave behind so many other personal items that were much more valuable. Mr. Coleman insisted that I take the two items at which point Mr. Gasparini had to intervene because Mr. Coleman's hostility was escalating. Mr. Gasparini stated to Mr. Coleman, "That's fine, Anthony can pick those things up when he comes back to get the rest of his stuff." I exited the office and stepped into the hallway. In a final and despicable attempt to further humiliate me, Mr. Coleman told me to leave out the side door emergency exit I told him that I refuse to do that because I wasn't hired through the side door and I win not leave that way. I told Mr. Coleman that I will walk out the front door, which I did, and I left.

* * *

After 28 years of dedicated and outstanding service to the Brooklyn Botanic Garden, my employment was terminated by them without any warning or notice. I was never given an exit interview, I was not permitted to take my personal property with me, I was not permitted to say goodbye to anyone, I was ordered to vacate the property immediately and I was told to leave through the side door. The termination was hostile and retaliation for my previous EEOC complaint.

[261-262]

## C. **Reduction in Force and Motion for Summary Judgment**

Around the same time that Mr. Quarless filed his initial complaint with the EEOC, BBG allegedly began implementing a number of "cost-cutting" measures. According to defendants, these measures were necessitated by BBG's poor financial condition, a state of affairs which began in the latter part of 2008.

28

Defendants claimed in the motion below that Mr. Quarless was terminated as part of a reduction in force plan ["RIF"].

Arguing that Mr. Quarless's termination was in no way retaliatory, the defendants moved for summary judgment on January 24, 2013, seeking to dismiss Mr. Quarless's outstanding retaliation claim. [8-117]

Plaintiff opposed and argued that that including him in RIF plan was nothing but a pretext for retaliation against plaintiff. [121-278]

## D.  Order Appealed From

The District Court granted the defendants' motion and dismissed the action in its entirety holding that plaintiff's termination was not retaliatory and plaintiff, in opposition, failed to establish a nexus between his EEOC complaints and his termination because there was a gap of 13 months between when BBG had notice of a complaint and Mr. Quarless's termination. [357]

Then in dicta, the District Court stated that even if plaintiff were able to establish a temporal nexus, BBG's deteriorating financial condition established a legitimate, non-discriminatory reason for his termination. [358-360] The Court held that in opposition, plaintiff failed to establish that

retaliation was a cause of the adverse employment action. [363-364]

Final Judgment dismissing the complaint, dated June 19, 2014 was entered [366] and this appeal ensued. [367]

## BRIEF SUMMARY OF ARGUMENT

Plaintiff challenges the dismissal of his retaliation claim based on a legitimate RIF plan; plaintiff contends that BBG used the RIF to terminate his employment to cover up retaliatory reasons.

In this regard, the District Court erred in focusing solely on the termination and ignored other adverse employment actions, including multiple negative performance reviews, withholding of salary increases, denying plaintiff multiple opportunities to attend trade conferences and lectures, and unilaterally amending plaintiff's job duties to take away his ability to carry a firearm, as evidence of retaliatory animus.

Either individually or taken together, these allegations are sufficient to raise issues of fact establishing that defendants' stated reasons for terminating plaintiff were pretextual [See, Zann Kwan v. Andalex Grp. L.L.C., 737 F3d 834, 846-47 [2d Cir. 2013] [holding that "shifting and somewhat inconsistent explanations" supporting a termination decision constituted "discrepancies" from which "a reasonable juror could

infer that the explanations ... were pretextual"]], and that defendants terminated plaintiff in retaliation for him making not only complaints to the EEOC, but also making informal complaints to BBG management. See, Cruz v. Coach Stores, Inc., 202 F3d 560, 566 [2d Cir. 2000] [stating that "the law is clear that opposition to a Title VII violation need not rise to the level of a formal complaint in order to receive statutory protection"]; Sumner v. United States Postal Serv., 899 F2d 203, 209 [2d Cir. 1990] [protected activities include "making complaints to management"]

The order appealed from should be reversed because the District Court violated the rules governing summary judgment. In place of the requirement to view the evidence in a light most favorable to the non-moving party and draw all favorable inferences in favor of the non-movant, the District Court impermissibly engaged in fact finding and credibility determinations.

## STANDARD OF REVIEW

This Court reviews de novo the district court's grant of summary judgment on Mr. Quarless's retaliation claims, construing the evidence in the light most favorable to the non-moving party. See, Tenenbaum v. Williams, 193 F3d 581, 593 [2d Cir. 1999], cert. denied sub nom, City of New York v. Tenenbaum,

529 US 1098 [2000]. In doing so, this Court must resolve all ambiguities and draw all factual inferences in favor of the non-movant. <u>Brown v. Henderson</u>, 257 F3d 246, 251 [2d Cir. 2001]. Summary judgment is not appropriate where a review of the record reveals sufficient evidence for a rational trier of fact to find in the plaintiff's favor. See, <u>Maresco v. Evans Chemetics</u>, 964 F2d 106, 110 [2d Cir. 1992].

<u>**ARGUMENT**</u>

**POINT I**

<u>**THE DISTRICT COURT ERRONEOUSLY CONCLUDED THAT PLAINTIFF FAILED TO ESTABLISH A PRIMA FACIE CASE OF RETALIATION**</u>

Generally, retaliation claims challenge the employer's reaction to an employee's opposition to alleged discrimination or participation in related proceedings. A party who is subjected to retaliatory action due to her or his opposition to a discriminatory practice or participation in an investigation or proceeding clearly may bring a claim for retaliation under Title VII of the 1964 Civil Rights Act.

**A.** **Retaliation Claims: Opposition**
 **Clause and Participation Clause**

Title VII forbids an employer[5] from discriminating against an employee "because he has opposed any practice made an

---

[5] An employer is liable under Title VII for violations committed by its employees while acting within the scope of their employment. See <u>Burlington</u>

unlawful employment practice by this title ..., or because he has made a charge, testified, assisted or participated in any manner in an investigation." 42 USC §2000e-3[a]; see also <u>Quinn v. Green Tree Credit Corp.</u>, 159 F3d 759, 768 [2d Cir. 1998].

The first clause is commonly referred to as the "opposition clause," the latter as the "participation clause[6]." <u>Glover v. S. Carolina Law Enforcement Div.</u>, 170 F3d 411, 413 [4th Cir. 1999] [Title VII's anti-retaliation provision thus "has two parts: the opposition clause and the participation clause."] The New York State and City Human Rights Laws contain similar anti-retaliation provisions[7].

This Court has expressly held that the opposition clause makes it unlawful for an employer to retaliate against an employee for making not only formal but informal protests of discriminatory employment practices, "including making

---

<u>Indus., Inc. v. Ellerth</u>, 524 US 742, 754-56 [1998] [citing Restatement [2d] of Agency § 219[1]]. "[T]angible employment actions" effectuated by a supervisor, "such as hiring, firing, failing to promote, [or] reassignment with significantly different responsibilities ... become[ ] for Title VII purposes the act of the employer." <u>Id.</u> at 760-62.

[6] Clearly, plaintiff's filing of a complaint with EEOC satisfies the "participation clause" element of a retaliation claim. <u>Townsend v. Benjamin Enterprises, Inc.</u>, 679 F3d 41 [2d Cir. 2012].

[7] See, Exec. Law § 296[1][e]; N.Y.C. Admin. Code § 8-107[7]. New York courts have consistently treated retaliation claims filed under the state and city Human Rights Laws in tandem with federal claims under Title VII. See <u>Del Castillo v. Pathmark Stores</u>, 941 FSupp 437, 438 n.1 [SDNY 1996].

complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges.'". Hubbard v. Total Communications, Inc., 347 FedAppx 679, 681 [2d Cir. 2009] citing Sumner, supra, 899 F2d at 209.

Opposition activity is protected so long as the plaintiff had a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F2d 590, 593 [2d Cir. 1988][citation and quotations omitted].

In this case, Mr. Quarless claimed that he suffered retaliation for opposing BBG's environment of race discrimination and was retaliated against because he advocated for systemic reform and the rights of minority employees; in doing so, plaintiff became a thorn in the side of BBG management who wanted to persist in unlawful discriminatory practices. This is quintessential opposition activity. See, Crawford v. Metropolitan Gov't of Nashville & Davidson Cnty., Tenn., 555 US 271, 276 [2009] ["When an employee communicates to her employer a belief that the employer has engaged in ... a form of employment discrimination, that communication 'virtually always'

34

constitutes the employee's opposition to the activity."] [citation and quotations omitted].

Mr. Quarless likewise engaged in opposition activity when he made complaints on his own behalf, rather than solely on behalf of others.   See, e.g., McKenzie v. Renberg's, Inc., 94 F3d 1478, 1486-87 [10th Cir. 1996] [recognizing that a personnel director could engage in protected opposition activity by "lodging a personal complaint about the wage and hour practices of her employer and asserting a right adverse to the company" rather than merely "assist[ing] the company in complying with its obligations under the FLSA"]; Ezuma v. City Univ. of New York, 665 FSupp2d 116, 123 [EDNY 2009] aff'd, 367 Fed App'x 178 [2d Cir. 2010] [distinguishing under the opposition clause between an employee who "was simply doing his job forwarding complaints that came to his attention, or, rather, was challenging the institution to take corrective action because he believed it was necessary to do so"],.

## B.   McDonnel Douglas Burden Shifting Analysis

Retaliation claims under Title VII are generally analyzed under a modified version of the McDonnell Douglas test[8].

---

[8] McDonnell Douglas Com. v. Green, 411 US 792, 802-05 [1973].

Tepperwien v. Entergy Nuclear Operations, Inc., 663 F3d 556 n.6 [2d Cir. 2011].

To establish a prima facie case of retaliation, first, the employee must show "[1] that she 'engaged in protected participation or opposition under Title VII, [2] that the employer was aware of this activity, [3] that the employer took adverse action against the plaintiff, and [4] that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action.'" Cifra v. Gen. Elec. Co., 252 F3d 205, 216 [2d Cir. 2001] [quoting Sumner, supra, 899 F2d at 208-09].

Second, if the plaintiff meets this burden, the defendant employer must then articulate a legitimate, non-discriminatory reason for its adverse employment action.

Third, if the employer does so, then the burden shifts back to the plaintiff to prove that retaliation was a substantial reason for the adverse action. Tepperwien, supra, 663 F3d at 556 n.6; see also Jute v. Hamilton Sundstrand Corp., 420 F3d 166, 173 [2d Cir. 2005].

As this Court has repeatedly stated, a plaintiff's burden at the prima facie stage is de minimis. See, e.g., Jute, supra, 420 F3d at 173; Treglia v. Town of Manlius, 313 F3d 713, 713,

719 [2d Cir. 2002]; Zimmermann v. Associates First Capital Corp., 251 F3d 376, 381 [2d Cir. 2001]; Byrnie v. Town of Cromwell, 243 F3d 93, 101 [2d Cir. 2001]; Howley v. Town of Stratford, 217 F3d 141, 150 [2d Cir. 2000]; Richardson v. New York State Dep't of Correctional Servs., 180 F3d 426, 444 [2d Cir. 1999]; Chambers v. TRM Copy Ctrs. Corp., 43 F3d 29, 37 [2d Cir. 1994]. Indeed, a plaintiff does not even have to prevail on the underlying claim of discrimination that gave rise to the "opposition" to discrimination[9]. Rather, a plaintiff need only establish that he or she personally was acting under a "good faith, reasonable belief" that he or she was the victim of an unlawful discriminatory action. See, Iannone v. Frederic R. Harris, Inc., 941 FSupp 403 [SDNY 1996]; Grant v. Hazelett Strip-Casting Corp., 880 F2d 1564, 1569 [2d Cir. 1989]; Davis v. State Univ. of New York, 802 F2d 638, 642 [2d Cir. 1986].

## C.   Adverse Employment Action

Consistent with the "de minimis" burden, this Court has taken an expansive view of what constitutes an "adverse employment action." See, Vergara v. Bentsen, 868 FSupp 581, 592 [SDNY 1994] [holding that in this circuit to show that the employer's conduct was "adverse," a plaintiff must only

---

[9] Thus, in this case, plaintiff's discontinuance of his race discrimination claims against the defendants is of no moment and irrelevant on the issue of his retaliation claim.

demonstrate that the conduct "affected the terms, privileges, duration, or conditions of the plaintiff's employment"]; Yerdon v. Henry, 91 F3d 370 [2d Cir. 1996] ["'An adverse action is one that affects the terms, privileges, duration, or conditions of employment"']. Thus, termination of employment is not the only way an employee can be subjected to an adverse employment action; other forms of employment action can sustain the burden, including negative performance reviews and loss of benefits, salary, or overtime.

Indeed, most courts that have considered the issue have held that section 704[a] broadly prohibits an employer from retaliating against its employees in any manner for engaging in protected activity and does not "limit its reach only to acts of retaliation that take the form of cognizable employment actions such as discharge, transfer or demotion." Passer v. American Chem. Soc'y, 935 F2d 322, 331 [DC Cir. 1991]. See Wideman v. Wal-Mart Stores, Inc., 141 F3d 1453, 1456 [11th Cir. 1998]; Wyatt v. City of Boston, 35 F3d 13, 15-16 [1st Cir. 1994]; Yartzoff v. Thomas, 809 F2d 1371, 1375 [9th Cir. 1987]; Berry v. Stevinson Chevrolet, 74 F3d 980, 984-86 [10th Cir. 1996]; Knox v. Indiana, 93 F3d 1327, 1334 [7th Cir. 1996] ["There is nothing in the law of retaliation that restricts the type of retaliatory

act that might be visited upon an employee who seeks to invoke her rights by filing a complaint."]

Indeed, this Court has held that a plaintiff suffers an "adverse employment action" if he endures a "materially adverse change in the terms and conditions of employment." Sanders v. New York City Human Resources Admin., 361 F3d 749, 755 [2d Cir. 2004]; see also, Treglia, 313 F3d at 720. Retaliatory financial penalties, of course, such as a reduction in pay occasioned by discipline or by the loss of overtime opportunities, constitute core "materially adverse" actions. See, e.g., Morris v. Lindau, 196 F3d 102, 110 [2d Cir. 1999] ["adverse employment action" includes reduction in pay]; Galabya v. New York City Bd. of Educ., 202 F3d 636, 640 [2d Cir. 2000] ["material loss of benefits"]; Austin v. Ford Models, Inc., 149 F3d 148, 153 [2d Cir. 1998] [denial of overtime pay]; Leiberman v. Reisman, 857 F2d 896, 900 [2d Cir. 1988] [denial of vacation time]; see also, e.g., Contes v. Porr, 02 Civ. 5194 [CM], 2004 WL 2699975, at *3 [SDNY Nov. 16, 2004]; Rigodon v. Deutsche Bank Sec., Inc., 04 Civ. 2548[GEL], 2004 WL 2471859, at *3 [SDNY Nov. 1, 2004]; Gilford v. City of New York, 03 Civ. 0091[SHS], 2004 WL 1574695, at *6 [SDNY Jul. 14, 2004].

As this Court has repeatedly emphasized, however, "adverse employment actions are not limited to 'pecuniary emoluments.'"

_Treglia_, 313 F3d at 720 [quoting _Preda v. Nissho Iwai Am. Corp._, 128 F3d 789, 791 [2d Cir. 1997]]; see also _Morris_, 196 F3d at 110. "Lesser actions such as negative employment evaluation letters may also be considered adverse." _Treglia_, 313 F3d at 720; see also _Morris_, 196 F3d at 110 ["adverse employment actions may include negative evaluation letters"] [citing _Bernheim v. Litt_, 79 F3d 318, 324-26 [2d Cir. 1996]]; cf. _Sanders_, 361 F3d at 756 [whether negative evaluation is adverse is question of fact].

By focusing only on the termination in July 2010, the District Court below failed to discuss the negative performance reviews by Mr. Cullina and Mr. Montes, withholding of merit salary increases, arbitrarily cutting the Security Department's budget so that Mr. Quarless's leadership qualities will be negatively impacted and unilaterally amending Mr. Quarless's ability to carry a firearm.

Indeed, there can be no dispute that the negative evaluations directly and permanently affected plaintiff's opportunities for merit salary increases and promotions.

## D.  **Protected Activity**

Defendants concede, as they must that plaintiff engaged in protected activity when he filed a complaint with EEOC; however, the District Court never addressed the issue of whether Mr.

Quarless's complaints to BBG management regarding acts of race discrimination against himself and others, were protected activity. As we discussed above, we believe that Mr. Quarless's informal complaints to BBG constituted a protected activity under the "opposition clause". See, Hubbard, 347 FedAppx at 681.

**E.**   **Knowledge**

With respect to the issue of knowledge, the District Court accepted BBG's argument below that the defendants did not have knowledge of Mr. Quarless's supplemental complaints made on April 20, 2010 [355], was only aware of the initial May 2009 EEOC Charge, "and were not aware of any of Quarless's additional submissions". [356] Based on this lack of notice, the District Court dismissed the retaliation claim. This conclusion was in error because even if BBG was not on notice of the supplemental filings with the EEOC, the District Court failed to recognize that BBG was on notice of the various complaints Mr. Quarless made to management between May 2009 and July 2010, that were independent of the EEOC complaints; these independent complaints sufficiently raised an issue of fact as to whether BBG had the requisite knowledge.

As we outlined above in the statement of facts, Mr. Quarless complained in May 2009 about the lack of any progress

made in Ms. Cabiness's investigation into the sexual harassment claims made by a female security officer against Mr. Henry. [28, 251]

In addition, Mr. Quarless alleged that as a result of his repeated complaints, someone had tampered with his email account stored on his computer in his office, causing all of his emails in 2007 to be deleted. Then in October 2009 Mr. Quarless complained about computer files were mysteriously deleted from his computer; the files contained parts of investigations he conducted at BBG. [251]

Thereafter in January 2010, plaintiff complained about Mr. Curtis receiving less pay than what was advertised, and that Mr. Curtis was the only manager at his level without an office or personal workspace. [29, 256-257]

Thus, even if it were true that BBG did not have any notice of Mr. Quarless's supplemental complaints to the EEOC, they were on notice of these informal complaints, which formed a sufficient basis for employer retaliation liability. Manoharan, supra.

Plaintiff has therefore, raised sufficient issues of fact warranting a denial of BBG's motion for summary judgment on the issue of knowledge.

**F.    Causation**

The District Court, in granting defendants' motion, held that plaintiff failed to satisfy the fourth element of causation because the thirteen month gap between May 2009 when plaintiff filed his initial EEOC complaint and July 2010, when plaintiff was terminated, was too remote to satisfy the "close temporal proximity" test.   This analysis was erroneous because the Court failed to take into account the direct evidence of retaliatory animus arising from a series of complaints Mr. Quarless made and the retaliatory adverse employment actions that were taken against him in direct response to those complaints.

In this regard, we freely acknowledge that "proof of causation can be shown either: [1] indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or [2] directly, through evidence of retaliatory animus directed against the plaintiff by the defendant."   <u>Gordon v. N.Y.C. Bd. of Educ.</u>, 232 F3d 111, 117 [2d Cir. 2000].

**1.    Evidence Of Retaliatory Animus**

Although courts have held that for "mere temporal proximity" to suffice, it "must be very close." <u>Clark Cntv. Sch. Dist. v. Breeden</u>, 532 US 268, 273-74 [2001] [internal quotation

43

marks omitted], the District Court's analysis here was flawed because it failed to view the evidence of retaliatory animus in the light most favorable to plaintiff. Indeed, the District Court simply disregarded significant evidence highly suggestive of defendants' retaliatory motive, including evidence of complaints made by Mr. Quarless to BBG management and the adverse employment actions that resulted from those complaints that were discussed in detail above.

"Title VII is violated when 'a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause.'" <u>Terry v. Ashcroft</u>, 336 F3d 128, 140-41 [2d Cir. 2003].

In this case, the record is replete with both direct and circumstantial evidence of retaliatory animus. Much of this evidence, by itself, would create an issue of fact as to defendants' intent. Taken together, it constitutes powerful proof of a 28-year veteran Director of Security with an exemplary record who, immediately after making complaints to BBG management about incidents of race discrimination and sexual harassment, became subject to a punitive campaign of negative evaluations, performance monitoring, discipline, loss of merit salary increases, and unilateral changes in his employment responsibilities and functions. This treatment was accompanied

44

by hostility from his supervisors, some of whom made explicit remarks disparaging plaintiff for having filed complaints.

Contrary to the District Court's erroneous factual conclusion that there was no evidence of retaliatory animus, the evidence in this record clearly revealed a coherent and readily identifiable portrait of a corporate culture that branded and punished those who dared to complain about misconduct and racial inequality.

Likewise, the District Court ignored numerous comments directly evincing retaliatory motive. Specifically, when Mr. Stubblefield left for another job, he warned Mr. Quarless to stop complaining about race discrimination to Ms. Cabiness because he will "regret it"; and "she could cause a lot of problems" if plaintiff continued to make complaints. [20, 238] In addition, during a conversation with Mr. Cullina in December 2007, the Vice President became angry and remarked that he was "tired of all the discrimination complaints" filed by Mr. Quarless. When Mr. Cullina asked Mr. Quarless for examples of how he was treating plaintiff differently, Mr. Quarless reminded him about the raise that he should gave gotten when he approved Rudy Rudloff's raise. Mr. Cullina's response was that there was nothing that stated that Mr. Quarless had to be given a raise. [26, 247]

Similarly in another conversation with Mr. Cullina to discuss the issue of overtime pay for the extra half hour the members of the security department worked, Mr. Cullina acknowledged to plaintiff and Mr. Curtis, that there was disparate treatment and that BBG was in violation of the contract but that the situation could not be corrected, because to do so would be an admission of guilt, the Garden may be sued, and he would not allow that to happen. Mr. Quarless was specifically told by Mr. Cullina to keep quiet and not to say anything, "and if the staff continue[ed] to complain, all of us including myself will be blamed". [26, 247]

Another direct expression of defendants' hostility to plaintiff occurred when Mr. Quarless met with Mr. Montes for his annual review in April, 2009. The review Mr. Montes gave Mr. Quarless was very similar to the review plaintiff received from Mr. Cullina the year before. In support of the poor review, Mr. Montes cited the plaintiff's support for a letter written by the security staff in 2007 complaining of disparate treatment in having to work an extra ½ hour and not getting paid overtime. Mr. Quarless thought that it was unfair to pin this on him because even though he agreed with the staff and the union members had a right to complain about the unfair employment practices; Mr. Montes's response was that the complaint

reflected poorly on Mr. Quarless's leadership skills; the complaints from the staff were ongoing and plaintiff would be "held accountable for it". [28, 251] Clearly, Mr. Quarless was punished by Mr. Montes for his demonstration of solidarity with the members of the security staff.

As this Court can readily see, in addition to the ultimate penalty of termination, following plaintiff's various complaints to BBG management, plaintiff's supervisors subjected him to a protracted campaign of retaliatory actions, large and small. However, in granting defendants' motion, the District Court erred in failing to consider the multiple negative performance reviews, withholding of salary increases, denying plaintiff multiple opportunities to attend trade conferences and lectures, and unilaterally amending plaintiff's job duties to take away his ability to carry a firearm, as instances of retaliatory animus.

## 2. Close Temporal Proximity

Although the District Court acknowledged that in deciding the summary judgment motion, it should consider the evidence as a whole, and view the evidence in the light most favorable to the plaintiff, its memorandum decision did just the opposite. The District Court's review of the evidence of temporal proximity is wholly tendentious and left out critical facts.

47

In assessing the temporal proximity between plaintiff's complaint and defendant's retaliatory actions, the District Court focused exclusively on the May 2009 EEOC complaint, erroneously reasoning that because plaintiff was not terminated until 13 months later in July 2010, no inference of causation arose.

However, as we discussed above, plaintiff engaged in additional protected activity when he made numerous complaints between May 2009 and July 2010 to BBG management. If the District Court had acknowledged these additional protected activities, then it should have denied defendants' motion, as a matter of law.

The District Court's dismissive statement that "there are nearly 13 months between plaintiffs protected activity and the alleged retaliatory action" and that "[s]uch a significant gap is insufficient to support an inference of retaliatory intent" [357], thus ignores the close temporal connection between the additional protected activity and adverse action. See Gorman-Bakos, 252 F3d at 555 [district court erred by not considering ongoing nature of complaints]; Treglia, 313 F3d at 721 [district court erred by not considering protected activity after initial protected activity]; Terry, 336 F3d at 133 [district court erred by failing to consider two EEO complaints subsequent to initial

complaint]; see also Housing Works, Inc. v. City of New York, 72 FSupp2d 402, 424 [SDNY 1999] [inference of causation where "[e]ven though a number of months may have elapsed between plaintiff's last demonstration and defendants' [adverse action], plaintiff continued actively litigating against the City even during that time"].

Further, the Court's analysis also ignored plaintiff's repeated informal complaints throughout the entire period, beginning in 2006 through 2010, and his complaints to supervisors about retaliation and hostility. As we stated above, such informal complaints to management constitute protected activity under Title VII. See, e.g., Cruz, supra, 202 F3d at 566; Sumner, supra 899 F2d at 209.

In sum, as the foregoing discussion of the evidence makes clear, there are close temporal connections between plaintiff's protected activities, which consisted of more than just the initial May 2009 EEOC complaint, and defendants' retaliatory actions. By failing to examine these connections at all and in the light most favorable to plaintiff, the District Court violated basic summary judgment principles as well as the substantive law of retaliation.

**DEFENDANTS' REDUCTION IN FORCE RATIONALE
FOR TERMINATING PLAINTIFF WAS NOTHING BUT A PRETEXT**

Defendants argued below that plaintiff's termination did not arise from retaliatory animus, but was based on legitimate reasons that had nothing to do with retaliation. Specifically, termination was necessary due to a downturn in the economy. Thus, Mr. Quarless was merely one of many employees who were terminated as part of an overall RIF plan.

Even assuming that economic concerns can be a legitimate business reason for adverse employment actions [see, Abdu-Brisson v. Delta Air Lines, Inc., 239 F3d 456, 469 [2d Cir. 2001]], the facts in this case raise significant issues of fact as to whether defendants' stated reasons for terminating plaintiff was pretextual and that defendants used the RIF plan as an excuse to terminate plaintiff in retaliation against his complaints. See, Zann, supra; Kinsella v. Rumsfeld, 320 F3d 309, 314 [2d Cir. 2003] [where the defendant claimed that the plaintiff was terminated as part of a legitimate RIF the plaintiff's allegations that the supervisor negatively commented on the plaintiff's disability and that the company rehired terminated employees who were not disabled, and some of whom were less experienced than the plaintiff, "would permit a reasonable finder of fact to conclude that [the defendant] used

the legitimate RIF as an opportunity to terminate [the plaintiff] because of his disability"]; Carlton v. Mystic Transp., Inc., 202 F3d 129, 136 [2d Cir. 2000] [holding that, where the plaintiff "never received a negative written performance evaluation or formal warning," and where there was not "any writing whatsoever criticizing [the plaintiff's] job performance," the defendant's explanation that plaintiff was fired for "poor job performance" may have been an "afterthought"]; Walerstein v. RadioShack Corp., No. 04-CV-1096, 2007 WL 1041668, at *7 [EDNY Mar. 30, 2007] [holding that the defendant's post-reduction-in-force decision to refill positions with "several non-disabled people" was "incompatible with [the defendant's] stated interest in reducing the staff at a store that was underperforming"]; Danzer v. Norden Sys., Inc., 151 F3d 50, 55 [2d Cir. 1998] ["while the facts that an employee's termination took place in the context of a reduction in force and that the employee was not replaced may well inform the general circumstances and hence may be considered by the jury when it weighs the submitted evidence, they rarely will be determinative at the summary judgment stage."].

In the motion below, plaintiff pointed out the many flaws in defendants' RIF justification, many of which the District Court improperly rejected as speculative and conclusory. See,

Ideal Steel Supply Corp. v. Anza, 652 F3d 310, 326 [2d Cir. 2011] ["The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists."]; Johnson v. IAC/Interactive Corp., 2 FSupp2d 504 [SDNY 2014]["[I]n determining whether the articulated reason for the action is a pretext, a fact-finder need not, and indeed should not, evaluate whether a defendant's stated purpose is unwise or unreasonable. Rather, the inquiry is directed toward determining whether the articulated purpose is the actual purpose for the challenged employment-related action." [internal quotation marks omitted]]; Holcomb v. Iona Coll., 521 F3d 130, 138 [2d Cir. 2008] ["To avoid summary judgment in an employment discrimination case, the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." [internal quotation marks omitted]].

Specifically, plaintiff argued below that BBG's reduction in force plan was not genuine because when the "plan" was formulated, Mr. Cullina admitted that there was no specific discussions about reduction in force as much as it was a

reduction period including potential layoffs or more often enforce the vacancies ... [159-160]

Mr. Montes testified that there were discussions at the senior management level about reduction in force because of budgetary shortfalls. [162-163] Further, when asked about BBG's response to plaintiff's EEOC complaint [180-181] he does not recall seeing it. [163] Mr. Montes further testified that there was a plan created analyzing the economic impact to the Garden but, he does not know if a written plan was created. [163-164]

Mr. Curtis testified that on the day of plaintiff's termination, he was called upstairs and met with Mr. Coleman and Mr. Gasparini. He was told that plaintiff was being reduced as a cost cutting measure but, he believed that Anthony's relationship with the institution wasn't friendly. [186-188]

Ms. Cabiness testified that she did not know who made the decision to include plaintiff's name in the RIF. [190] Further, when the RIF list was created, she was not consulted. [193] Additionally, there was no analysis of the entire pool of employees relative to costs. [195-196] Ms. Cabiness proclaimed that BBG was comfortable with Mr. Curtis heading security despite their reservations three [3] years earlier. [202-206] She further testified that she had never seen BBG's letter

response to plaintiff's EEOC complaint, nor was there a financial analysis attached. [208-210]

Mr. Gasparini testified that there was a written reduction in force plan on an excel spreadsheet but, is unsure when it was created. [216-217, 264-265] The spreadsheet was undated and unverified. More importantly, the names on that spreadsheet were different than the names presented as the RIF in BBG's response to the EEOC complaint! Compare 264-265 with 184.

During the analysis, they did not review costs savings by reducing managers above director. [217] When asked about BBG's response to plaintiff's EEOC complaint, he testified that he discussed the RIF plan with Ms. Cabiness, the HR Director, before implementing it. [218-221] This clearly conflicted with Ms. Cabiness's testimony that she was never consulted on this issue and never met with anyone about the letter.

Mr. Medbury testified there were discussions about a reduction in force but not really a report. [166-169] Further, when asked about BBG's response to the EEOC complaint, Mr. Medbury responded that he has not seen it. [173-174] Nor did he know when the list was created. [174] This is quite incredible considering that Mr. Medbury was the CEO of BBG

BBG's mere assertion of a RIF does not, of course, insulate it from scrutiny under Title VII. Meiri v. Dacon, 759 F.2d 989, 995 (2d Cir. 1985).

In this case, the record establishes significant issues of fact warranting a denial of defendants' motion for summary judgment. First, as conceded by the defendants, there was no specific discussions about the RIF as confirmed by Mr. Cullina [160] Secondly, other than the fact that plaintiff was terminated there was no evidence as to which manager actually made the decision to put plaintiff's name on the list. If this was truly a reduction in force plan, this would be an easy answer. Third, there was no evidence that there was ever a reduction in force plan.

This was confirmed by Mr. Montes, Ms. Cabiness, and Mr. Medbury, each of whom denied seeing a copy of BBG's response to the EEOC complaint. [163, 166-169, 208-210] We note that the letter was prepared on the letterhead of BBG's attorneys [180], the same ones who are defending BBG in this litigation.

Equally significant, in support of the motion for summary judgment, defendants submitted an affidavit from Mr. Gasparini who contradicted himself when he claimed that he had not spoken to Ms. Cabiness and she did not participate in the selection of the positions to be eliminated in accordance with the RIF plan.

55

[89-90] This affidavit should be rejected because it is nothing but an ill-disguised attempt to raise feigned issues designed to avoid the consequences of his sworn deposition testimony.

Nor was this all. Ms. Cabiness also submitted an affidavit in which she contradicted herself; she now claimed to have all of this knowledge about BBG's financial plans when she denied such knowledge at her deposition. [83] This affidavit also raised feigned issues.

Most important, BBG failed to produce any documents showing that Mr. Quarless's name appeared on any RIF plan before he filed his EEOC complaint and supplemental complaints.

Based on the foregoing, there are significant issues of fact warranting a denial of defendants' motion for summary judgment as to whether the RIF plan was an afterthought because there was no evidence that Mr. Quarless was ever selected on that list before his EEOC complaints.

## CONCLUSION

Based on the foregoing, we respectfully request that this Court reverse the order appealed from and issue such other further and different relief as this Court deems just and proper under the circumstances.

Dated:     New York, NY
           October 15, 2014

                              Respectfully submitted,
                              Michael H. Zhu, Esq, PC
                              Attorneys for Plaintiff-Appellant

              By:     _____

                              Michael H. Zhu

                              225 Broadway Suite 307
                              New York, NY 10007
                              212-227-2245
                              mzhu@mzhulaw.com

57

**SPECIAL APPENDIX**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
ANTHONY C. QUARLESS,

                           Plaintiff,

        - against -

BROOKLYN BOTANIC GARDEN CORP.,
SCOT D. MEDBURY, as President and Chief Executive
Officer; and ROCHELLE CABINESS, as Director of
Human Resources, each being sued individually and
in their official capacities as employees of defendant
BROOKLYN BOTANIC GARDEN CORP.,

                           Defendants.
-------------------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
11-CV-05684 (CBA) (RER)

AMON, Chief United States District Judge.

        Plaintiff Anthony C. Quarless brings this action against the above-captioned defendants pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000-e et seq., 42 U.S.C. § 1981, the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296, and the New York City Human Rights Law ("NYCHRL"), N.Y. City Admin. Code § 8-107. Quarless alleges that he was terminated by his former employer, the Brooklyn Botanic Garden ("BBG"), in retaliation for complaining about discrimination at BBG and for filing complaints of racial discrimination with the Equal Employment Opportunity Commission ("EEOC"). The claims in the complaint of race discrimination and hostile work environment were withdrawn, as well as all claims against defendants Frank Montes and Patrick Cullina. (DE #29.) The remaining defendants move for summary judgment on the outstanding retaliation claims. For the reasons set forth below, the defendants' motion for summary judgment is granted.

## BACKGROUND

### I.   Factual Background

Quarless, an African-American male, began working at BBG, a 52-acre museum of plant collections and specialty gardens, in or around June 1982 as a seasonal guard.  (Compl. ¶¶ 9-10; Defs. R. 56.1 ¶¶ 1, 4.)  Over the course of his employment, he was promoted on at least four occasions, culminating in his promotion in 2000 to Director of Security, a position he held until his termination in July 2010.  (Defs. R. 56.1 ¶¶ 5-6; Quarless Dep. at 103-04.)

Quarless asserts that over his 28-year career at BBG, he repeatedly complained to BBG management, the Director of Human Resources Rochelle Cabiness, and ultimately the EEOC about race and gender discrimination that he experienced or witnessed at BBG.  These complaints began in 1985, around the time Quarless was promoted to supervisor, with Quarless's complaint to the BBG president that the security director at the time was discriminating against him and another black supervisor by not issuing them a supervisor's uniform.  Quarless was subsequently issued the proper uniform.  (Quarless Dep. at 198-200; Defs. R. 56.1 ¶ 23.)  More than a decade later, in 1997, after he had been promoted to a senior supervisor position, Quarless complained to Cabiness that the then security director was discriminating against minority members of the security department.  The discriminatory behavior ceased following his complaint.  (Quarless Dep. at 201-02; Defs. R. 56.1 ¶ 24.)

Quarless's complaints and alleged experiences with discrimination persisted after he was promoted to Director of Security in 2000.  According to Quarless, in 2004, Keith Stubblefield, a former Vice President of Finance and the manager who oversaw human resources, verbally reprimanded him after a white female employee complained that Quarless had verbally assaulted her, even though an investigation into the allegations had not yet been conducted.  Quarless

2

states that the female employee eventually confessed that she fabricated the story but was never reprimanded and that he never received an apology.  (Sanders Decl., Ex. 10 at 4; Quarless Dep. at 203-05; Defs. R. 56.1 ¶ 25.)

Two years later, in August 2006, Quarless again complained to Cabiness, describing in an email what he perceived to be "systemic discriminatory practices within the institution." (Quarless Dep. at 196-97; 206-210; Defs. R. 56.1 ¶ 27.)  Quarless referenced two events that occurred that year: (1) an incident in which a Caucasian teenage intern allegedly caught stealing coins from a fountain was not arrested; and (2) an episode where a Caucasian BBG employee "disrespected" Quarless by not promptly displaying his ID badge after being told to do so, but was never disciplined.  (Quarless Dep. at 196, 206-09; Defs. R. 56.1 ¶ 26.)  Quarless testified that a week or two after he sent the email, Mr. Stubblefield brought Quarless and Cabiness to his office to discuss the email.  According to Quarless, Cabiness stated that she was "very angry as a black woman to even have received the e-mail."  (Quarless Dep. at 213, 219.)  Quarless testified that Cabiness refused to investigate his complaints of discrimination and that when he raised this failure late in 2006 with Mr. Stubblefield he was told "that I need to stop complaining about Rochelle Cabiness or I'm going to regret it."  (Id. at 220, 273-74.)

Quarless's next complaint came in the April 2009 self-evaluation that he provided to his then supervisor, Frank Montez, in which he reiterated many of the concerns about discrimination at BBG that he had raised in previous complaints.  (Defs. R. 56.1 ¶ 28; see Quarless Dep. at 79-80, 221.)  He alleges that he subsequently received a poor annual performance evaluation blaming him for complaints of discrimination filed by the security department staff to the union, District Council 37.  (Sanders Decl., Ex. 10 at 22.)

On May 27, 2009, shortly after receiving this negative evaluation, Quarless filed a charge with the EEOC. (Sanders Decl. Ex. 9; Defs. R. 56.1 ¶ 29.) BBG received notice that he filed this charge in June 2009. (Defs. R. 56.1 ¶ 30; Cabiness Aff. ¶ 16.) Right after he filed the complaint, Quarless alleges, someone at BBG tampered with his personal computer account, deleting emails and other files relating to his complaints of discrimination and past investigations. (Sanders Decl., Ex. 10 at 22.)

Quarless supplemented and updated his EEOC charge several times. On October 28, 2009, referencing his pending charge, Quarless submitted to the EEOC a narrative and timeline describing his "ongoing retaliation for complaining when [he] was treated unfairly" at BBG. (Sanders Decl., Ex. 10.) Quarless again supplemented his administrative complaint on January 29, 2010, alleging that BBG was paying Glenn Curtis, the Assistant Director of Security, below the advertised rate. (Sanders Decl., Ex. 11.) On April 20, 2010, Quarless updated his EEOC charge to include a letter sent to District Council 37, signed by all of the BBG security staff, alleging racial discrimination at BBG. (Sanders Decl., Ex. 12.)

Around the same time that Quarless filed his initial complaint with the EEOC, BBG began implementing a number of cost-cutting measures. According to defendants, these measures were necessitated by BBG's poor financial condition, a state of affairs which began in the latter part of 2008. (Defs. R. 56.1 ¶ 7; Cabiness Aff. ¶ 6.) The vast majority of employees did not receive any salary increase that would otherwise have become effective in 2009 or 2010. (Defs. R. 56.1 ¶ 8; Cabiness Aff. ¶ 6.) In addition, in 2009, BBG furloughed all employees for five days and eliminated nine positions. (Defs. R. 56.1 ¶¶ 9-10; Cabiness Aff. ¶ 7.) Defendants claim that because BBG's financial condition did not improve in 2010, it was forced to eliminate

eight more positions and reduce employee salaries. (Defs. R. 56.1 ¶¶ 11-12, 17-18; Cabiness Aff. ¶¶ 8-11.)

On or about July 13, 2010, Quarless was visited by Richard Coleman, the Vice President of Facilities, Planning, Construction and Management, and Mark Gasparini, the Vice President of Finance and Chief Financial Officer, who informed him that BBG was terminating him as part of a reduction in force. (Quarless Dep. at 55, 104; Gasparini Aff. ¶ 9; Sanders Decl., Ex. 13.) According to defendants, Quarless was terminated because the Director of Security position was one of the eight selected for elimination as part of BBG's cost-cutting efforts. (Defs. R. 56.1 ¶¶ 13, 15, 17; Cabiness Aff. ¶¶ 10-11.) Quarless's position, BBG states, was chosen for elimination because the Assistant Director of Security could assume the duties previously held by the Director of Security. (Defs. R. 56.1 ¶¶ 14-15; Cabiness Aff. ¶¶ 10-11.) As both parties admit, Quarless's position was not filled, and instead Glen Curtis, the Assistant Director of Security, assumed the duties previously performed by Quarless. (Defs. R. 56.1 ¶¶ 21-22; Pl. R. 56.1 ¶¶ 21-22.) Curtis did not officially become the Director of Security, but he managed the department under the direct supervision of Gasparini. (Cabiness Dep. at 256.)

After Coleman and Gasparini informed Quarless that he was terminated, they handed him a document and told him to vacate the premises immediately through a side door without giving him a few minutes to gather his personal belongings. (Quarless Dep. at 104, 107; Sanders Decl., Ex. 13.) Quarless initially protested, but then left his belongings in his office and exited the building through the front door. (Quarless Dep. at 108-09.) Quarless then contacted the New York City Police Department and returned the next day with a police escort to collect his belongings. (Id. at 109.)

5

On March 2, 2011, Quarless wrote to Jean Mulligan, an EEOC Investigator, informing her that in light of his termination, he was filing a second charge against BBG for unlawful retaliation. (Sanders Decl., Ex. 13.)

## II. Procedural History

The EEOC issued Quarless a right-to-sue letter on August 18, 2011. (Sanders Decl., Ex. 9.) Quarless subsequently filed this action on November 21, 2011, asserting claims of race discrimination, hostile work environment, and retaliation in violation of Title VII, 42 U.S.C. § 1981, the NYSHRL, and the NYCHRL. During a pre-motion conference held on November 16, 2012, Quarless agreed to withdraw all claims related to race discrimination and hostile work environment, leaving only his retaliation claims against defendants. (DE dated 11/16/2012.) Quarless also agreed to dismiss defendants Patrick Cullina and Frank Montez from this case. (DE #29; #30.)

Arguing that Quarless's termination was in no way retaliatory, the remaining defendants filed the instant motion for summary judgment on January 24, 2013, seeking to dismiss Quarless's outstanding retaliation claims. (DE #21.) Specifically, defendants claim that (1) Quarless has not established a prima facie case of retaliation; (2) even assuming that he has established a prima facie case, that he has failed to adduce evidence sufficient to carry his burden of proving that BBG's asserted reason for terminating him was a pretext for retaliation; and (3) that defendant Cabiness cannot be held individually liable.

6

## DISCUSSION

### I. Summary Judgment on Quarless's Federal and State Retaliation Claims

#### A. Standard of Review

Summary judgment is appropriate when the pleadings and evidence that would be admissible at trial show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 309 (2d Cir. 2008). This Court's function is not to resolve disputed issues of fact but "to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

The moving party carries the initial burden of demonstrating the absence of a material factual question. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In determining whether this demonstration has been made, this Court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant." Brod v. Omya, Inc., 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted). Nevertheless, the non-moving party cannot rest merely on speculations, conjecture or denials but "must set forth specific facts showing that there is a genuine issue for trial." See Irizarry v. Catsimatidis, 722 F.3d 99, 103 n.2 (2d Cir. 2013) (quoting Rubens v. Mason, 527 F.3d 252, 254 (2d Cir. 2008)). A genuine issue exists only where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (internal citations omitted).

In retaliation cases, courts must be mindful that a victim of retaliation is "seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative

weight of circumstantial evidence." See Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir. 1991)

(discussing discrimination cases). Nonetheless, as the Second Circuit has made clear, "summary

judgment remains available for the dismissal of [retaliation] claims in cases lacking genuine

issues of material fact." Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006)

(internal quotation marks omitted); see also Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456,

466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in

the fact-intensive context of discrimination cases.").

### B. Quarless's Title VII and § 1981 Retaliation Claims

Quarless alleges that BBG terminated him in retaliation for making various complaints of

race and gender discrimination in the workplace. Quarless's Title VII and § 1981 claims are

analyzed under the same burden-shifting framework.[1] See Hicks v. Baines, 593 F.3d 159, 164

(2d Cir. 2010); Bowen-Hooks v. City of New York, --- F. Supp. 2d ---, 2014 WL 1330941, at

*16 (E.D.N.Y. 2014). Title VII, "prohibits an employer from taking 'materially adverse' action

against an employee because the employee opposed conduct that Title VII forbids or the

employee otherwise engaged in protected activity." Tepperwein v. Entergy Nuclear Operations,

Inc., 663 F.3d 556, 567 (2d Cir. 2011). § 1981 guarantees all persons the same right to make and

enforce contracts as is enjoyed by white citizens and "encompasses retaliation claims" as well as

discrimination claims. CBOCS West, Inc. v. Humphries, 553 U.S. 442, 451 (2008).

#### 1. Title VII and § 1981 Retaliation Framework

Retaliation claims under Title VII and § 1981 are evaluated using the McDonnell

Douglas three-step burden-shifting framework. See Jute v. Hamilton Sundstrand Corp., 420 F.3d

---

[1] As discussed below, although the same burden-shifting framework is utilized in analyzing both Title VII and §
1981 claims, after University of Texas Southwestern Medical Center v. Nassar, 133 S. Ct. 2517 (2013) the causation
standard used in analyzing § 1981 and Title VII claims may differ.

166, 173 (2d Cir. 2005); see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973). First, the plaintiff must establish a prima facie case of retaliation by demonstrating: "'(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.'" Hicks, 593 F.3d at 164 (quoting Jute, 420 F.3d at 173). The plaintiff's burden at this stage is "de minimis," and "the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." Jute, 420 F.3d at 173.

If the plaintiff is able to establish a prima facie case, a "presumption of retaliation arises," and the burden then shifts to the employer to proffer a legitimate, non-retaliatory reason for the adverse employment action. Id. Once the employer offers such proof, "the presumption of retaliation dissipates," and the burden shifts back to the employee show that retaliation was a cause of the adverse employment action. Id.; Hicks, 593 F.3d at 164-65. Prior to University of Texas Southwestern Medical Center v. Nassar, 133 S. Ct. 2517 (2013), a plaintiff could satisfy the causation requirement at this stage by showing that "retaliation was a substantial reason for the adverse employment action." Jute, 420 F.3d at 173.

In Nassar the Supreme Court held that "Title VII retaliation claims must be proved according to traditional principles of but-for causation." 133 S. Ct. at 2533. This causation standard requires "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Id. Although prior to Nassar § 1981 and Title VII cases were decided under the same standard, e.g. Patterson v. County of Oneida, 375 F.3d 206, 226 (2d Cir. 2004), following Nassar the causation standards in § 1981 and Title VII retaliation claims may differ. However, we need not decide whether Nassar's but-for

9

requirement applies to § 1981 claims, or if §1981 cases are still governed by the motivating factor test, because we hold that defendants are entitled to summary judgment under both the but-for and the motivating factor causation standards.

### 2. Quarless's Prima Facie Case of Retaliation

Defendants concede for purposes of this motion that Quarless has established the first three elements of his prima facie case. (Defs. Mem. at 8.) They contend that Quarless cannot establish the fourth element, a causal connection between his prior complaints of race and gender discrimination and his termination, because there is no evidence of direct retaliatory animus and because there is insufficient indirect evidence to establish the requisite causal connection.

A plaintiff can prove a causal connection between the protected activity and the adverse employment action "either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by defendant." Hicks, 593 F.3d at 170 (internal quotation marks and citations omitted). As defendants assert, and Quarless does not contradict, the record before this Court is devoid of any direct evidence of retaliatory animus. Instead, Quarless relies on the close temporal proximity between Quarless's April 20, 2010 update to his EEOC charge and his termination on July 13, 2010. (Pl. Mem. at 11-12.)

"Close temporal proximity between the plaintiff's protected action and the employer's adverse employment action may in itself be sufficient to establish the requisite causal connection" to make out a prima facie case of retaliation. Kaytor v. Electric Boat Corp., 609 F.3d 537, 552 (2d Cir. 2010); see also Zann Kwan v. Andalex Group LLC, 737 F.3d 834, 845 (2d Cir. 2013) (holding that Nassar did not alter the ability to demonstrate causation through

reliance on temporal proximity). For "mere temporal proximity" to suffice, however, it "must be very close." Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (internal quotation marks omitted). Indeed, although the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty., 252 F.3d 545, 554 (2d Cir. 2001), courts in this circuit "have consistently held that a passage of more than two or three months between the protected activity and the adverse employment action does not allow for an inference of causation," Murray v. Visiting Nurse Servs., 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007); see also Frisenda v. Inc. Vill. of Malverne, 775 F. Supp. 2d 486, 512 (E.D.N.Y. 2011); Chin-McKenzie v. Continuum Health Partners, 876 F. Supp. 2d 270, 287 (S.D.N.Y. 2012) (collecting cases). A seven or eight month gap between a plaintiff's protected activity and the adverse action can support an inference of causation where other circumstances bolster the otherwise attenuated connection between the protected activity and the retaliatory action. See Summa v. Hofstra Univ., 708 F.3d 115, 128-29 (2d Cir. 2013) (holding a seven month period not "prohibitively remote").

Quarless asserts that this Court can infer causation here because his last pre-termination submission to the EEOC occurred on April 20, 2010, less than three months before his termination on July 13, 2010. Defendants maintain that during Quarless's employment they were aware of only the initial May 2009 EEOC charge, which the EEOC provided BBG notice of in June 2009, and were not aware of any of Quarless's additional submissions. Defendants further argue that Quarless presents no evidence that defeats that assertion. (Defs. Reply at 7-8; Defs. R. 56.1 ¶ 30.)

11

Although the record indicates that several individuals at BBG were aware of Quarless's initial EEOC charge, no evidence indicates that anyone at BBG had notice that Quarless sent additional letters to the EEOC. (Medbury Dep. at 98; Curtis Dep. at 37-38; Cabiness Dep. at 248; Gasparini Dep. at 15-16.) Indeed, at oral argument, plaintiff conceded that there was no evidence that defendants received notice of the later filed complaints. (Oral Arg. Tr. at 29-30.)[2] Even under its minimal burden at the prima facie stage, plaintiff must present "admissible evidence [that] would be sufficient to permit a rational finder of fact to infer a retaliatory motive." Jute, 420 F.3d at 173. In deciding whether plaintiff has met its burden, this Court must "carefully distinguish between evidence that allows for a reasonable inference of retaliation and evidence that gives rise to mere speculation and conjecture." Bickerstaff v. Vassar Coll., 196 F.3d 435, 448 (2d Cir. 1999).

A conclusion that anyone at BBG was aware of plaintiff's additional letters to the EEOC would be "mere speculation" and such impermissible speculation cannot support finding a causal connection. Because there is no evidence that anyone at BBG received notice of Quarless's supplemental letters, this Court uses the June 2009 date on which defendants received notice of plaintiff's EEOC charge as the operative date in determining whether temporal proximity could support an inference of retaliation. Using the June 2009 date, there are nearly 13 months between plaintiff's protected activity and the alleged retaliatory action. Such a significant gap is insufficient to support an inference of retaliatory intent.

Accordingly, this Court finds that plaintiff has failed to establish a prima facie case of retaliation.

---

[2] "Q: "Is there any evidence in the record that [defendants] knew about the later letter[s] that [plaintiff] filed [with the EEOC]?"
A: "No, there is no evidence on specific dates."

### 3. *BBG's Nondiscriminatory Reason for the Termination*

Even assuming Quarless has come forward with sufficient evidence to establish a prima

facie case of retaliation, defendants have in turn identified a legitimate, nondiscriminatory reason

for his termination, specifically, BBG's deteriorating financial condition.  See Leibowitz v.

Cornell Univ., 584 F.3d 487, 503-04 (2d Cir. 2009); Moccio v. Cornell Univ., 889 F. Supp. 2d

539, 591 (S.D.N.Y. 2012).  Defendants argue that BBG's precarious financial state prompted a

number of cost-cutting measures including a reduction in workforce that eventually included the

elimination of Quarless's position and his concomitant termination.

To substantiate their claims, the defendants have offered affidavits and deposition

testimony illustrating BBG's financial condition.  Cabiness stated in her affidavit that beginning

in the latter part of 2008, BBG's financial condition worsened to the point that BBG started to

contemplate layoffs and was unable to provide any scheduled salary increases for the vast

majority of employees in 2009 or 2010.  (Cabiness Aff. ¶ 6; Gasparini Aff. ¶¶ 2-3.)  As part of its

cost cutting efforts, in 2009 BBG eliminated nine positions, terminated the employees then

filling those positions, and furloughed all employees for five days.  (Cabiness Aff. ¶ 7; Gasparini

Aff. ¶ 4.)  With New York City budget cuts and a depressed economy adding to BBG's

economic woes, BBG was forced to eliminate one additional position in January 2010, and

reduced employees' salaries.  (Cabiness Aff. ¶¶ 8-10, 12; Gasparini Aff. ¶¶ 5-7.)

In the early part of 2010, BBG began to contemplate eliminating additional positions,

(Cabiness Aff. ¶ 10; Gasparini Aff. ¶ 7), and effective July 2010, BBG terminated seven

additional employees (Cabiness Aff. ¶ 11; Gasparini Aff. ¶ 9).  As part of this reduction,

Quarless's position was eliminated and he was one of the seven employees fired.  (Id.)  BBG

asserts that after analyzing what positions it could eliminate and have existing employees

13

perform those functions, it decided to eliminate Quarless's position because his job functions could be split between the vice president and the assistant director of security. (Medbury Dep. at 97-98; Gasparini Aff. ¶¶ 7-8; Cabiness Aff. ¶ 11.) Indeed, after his termination, Quarless was not replaced, rather Glen Curtis, the Assistant Director of Security, assumed the basic functions of the eliminated position (Cabiness Aff. ¶ 15; Gasparini Aff. ¶ 10), a fact which Quarless does not contest (Pl. R. 56.1 ¶¶ 21-22).

In total, BBG eliminated seventeen positions and instituted various cost-cutting measures in 2009 and 2010. (Cabiness Aff. ¶¶ 6-8, 10-13; Gasparini Aff. ¶¶ 2-8; Medbury Dep. at 22-24.) Defendants' met their burden of establishing a non-retaliatory reason for terminating Quarless. See Williams v. Home Depot U.S.A., Inc., 02-Civ.-5353, 2005 WL 2429421, at *13 (S.D.N.Y. Sept. 30, 2005) aff'd, 196 F. App'x 47 (2d Cir. 2006) (In the Title VII context, "[a]n affidavit of the person responsible for implementing an employer's reduction in force articulating a reasonable explanation for the decision satisfies a defendant's burden at this stage of the McDonnell Douglas analysis."); see also Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1226 (2d Cir. 1994) (In the ADEA context, the defendant "presented affidavits of its various officers to show that at the time it discharged Gallo the company was in a business downturn and that a reduction-in-force was necessary to meet its budgetary goals. This evidence [was] enough to rebut the presumption of age discrimination that Gallo's prima facie case established.").

In addition to supplying affidavits and deposition testimony supporting their assertions, the defendants have also pointed out several instances where Quarless admits to knowing BBG was struggling financially. At his deposition, Quarless admitted that he was aware that BBG was facing financial difficulties in 2009. (Quarless Dep. 54-55.) He also acknowledged that there

14

were furloughs in 2009, and that a number of BBG employees were laid off in 2009 and 2010. (Id. at 54-56.) These admissions further bolster the defendants' argument that BBG was financially unsound.

Accordingly, this Court finds that the defendants have submitted evidence which "taken as true, would permit the conclusion that there was a non[-retaliatory] reason" for Quarless's termination. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993).

### 4. Evidence of Pretext

Because defendants have met their burden of demonstrating a legitimate, non-retaliatory reason terminating Quarless the "presumption of retaliation arising from the establishment of the prima facie case drops from the picture." Kwan, 727 F.3d at 845. To avoid summary judgment Quarless must come forward with evidence sufficient to create a genuine issue of material fact such that a reasonable fact-finder could conclude that but-for his complaints to the EEOC he would not have been terminated. See Nassar, 133 S. Ct. at 2533.[3] "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action" such that a jury could conclude that defendants' articulated non-retaliatory reason is mere pretext and that retaliation was a but-for cause of plaintiff's termination. Kwan, 727 F.3d at 846.

Quarless attempts to demonstrate that defendants' articulated non-retaliatory rational is mere pretext by relying on what he considers to be inconsistencies in testimony about the

---

[3] Although this Court analyzes this prong of the burden shifting test under the "but-for" causation standard applicable to Title VII retaliation claims, it is at least unclear whether § 1981 retaliation claims should be analyzed under the more lenient motivating factor test. Under that test plaintiff need only demonstrate that the articulated reason was "not the only reason[]" for the retaliatory action "and that the prohibited factor was at least one of the motivating factors." Garcia v. Hartford Police Dept., 706 F.3d 120, 127 (2d Cir. 2013). For the reasons articulated, this Court finds that even if § 1981 employs the motivating factor causation standard, Quarless still failed to carry his burden at this stage of the burden shifting test.

decision to fire him and a perceived lack of documentary evidence supporting the existence of a formal reduction in force plan. (Pl. Mem. at 11-12.) Any alleged inconsistencies are minor, and defendants have provided ample testimony that supports the assertion that BBG terminated Quarless for a legitimate non-retaliatory reason. Defendants were under no obligation to rely on the specific documentary evidence Quarless alleges they failed to provide.

For instance, Gasparini testified that BBG sought to terminate employees in middle management who occupied positions "where there would be a strong enough employees' base below that could handle the job and continue operating the department" and that Quarless was terminated because "we felt there was management level there to support the department." (Gasparini Dep. at 10, 15.) In an attempt to call this testimony into question, Quarless alleges that Gasparini submitted an affidavit in support of the motion for summary judgment that contradicted testimony that he gave at deposition. At deposition, Gasparini testified that he spoke with Cabiness before implementing a reduction in force plan. (Gasparini Dep. at 16.) In his affidavit, Gasparini alleged that Cabiness "did not participate in the selection of positions to be eliminated." (Gasparini Aff. ¶ 8.) Quarless argues that these two statements are inconsistent. However, these statements are entirely consistent; as defendants pointed out at oral argument, Gasparini did discuss with Cabiness the prospect of financial layoffs, but Cabiness did not have any role in the selection of who would be laid off. (See Oral Arg. Tr. at 12-13.)

Quarless points to other minor inconsistencies that similarly carry little, if any, persuasive value. He attaches significance to the fact that a list of terminated employees that BBG submitted to the EEOC differed from an earlier prepared list of employees that BBG considered terminating. (Pl. Mem. at 9-10.)[4] At oral argument, it became clear that the earlier prepared list of proposed terminations was created by a former BBG employee to determine the financial

---

[4] Quarless was included on both lists. (Sanders Decl. Exs. 5, 14.)

16

impact of eliminating certain positions and the second list was a list of employees actually

terminated. (Oral Arg. Tr. at 18-19.) The fact that BBG's economic analysis of employees it

considered terminating and BBG's list of actually terminated employees is not co-extensive is of

little consequence. (Sanders Decl. Exs. 5, 14.)[5] Certainly, the discrepancy between the list is not

evidence that undermines the undisputed claim that BBG was suffering financial difficulties.

Nor is it any evidence that BBG in fact retaliated against Quarless by terminating his

employment.

Quarless also notes the absence of "business records" supporting BBG's claims that its

financial condition necessitated various lay-offs, furloughs, and hiring and salary freezes. (See

Pl. Mem. at 11-12; Pl. R. 56.1 ¶¶ 8-19.) There is, however, uncontroverted evidence that BBG

was suffering financial difficulties and that Quarless was terminated as part of a larger reduction

in workforce. Defendants' established a non-retaliatory reason for terminating Quarless. See

Williams, 2005 WL 2429421 at *13; Gallo, 22 F.3d at 1226; O'Sullivan v. New York Times, 37

F. Supp. 2d 307, 316 (S.D.N.Y. 1999) ("The defendant has clearly met its burden in rebutting

plaintiffs' prima facie case by offering numerous affidavits and depositions demonstrating the

non-discriminatory basis for its decisions to discharge plaintiffs."). In fact, another judge in this

district relied on almost identical evidence in another suit against BBG in concluding that BBG

---

[5] Pointing to another supposed inconsistency, Quarless argues that in the past BBG expressed reservations about Glenn Curtis, the employee who replaced Quarless, but now states that it terminated Quarless in part because it believed Curtis could assume Quarless's duties. (Pl. Mem. at 9.) Quarless's argument is essentially that BBG changed its opinion of Curtis's qualifications in an effort to obfuscate its retaliatory motivation. (Oral Arg. Tr. at 34.) However, at deposition, Cabiness explained that in 2007, Curtis would not have brought any "new skills to the table," but, in 2010, Curtis was fully competent to run the security department because there was nothing new in the department with which Curtis was not familiar. (Cabiness Dep. at 252-53.) In addition, it is undisputed that BBG did not hire a new Director of Security and that Curtis in fact assumed many of Quarless's duties. (Pl. R. 56.1 ¶ 21-22.) This supposed change in BBG's opinion of Curtis's qualifications carries no persuasive value.

had produced enough evidence to shift the burden back to the plaintiff. Louis v. Brooklyn Botanic Garden, No. 10-CV-5406(JG)(LB), 2011 WL 3857127 at *7 (E.D.N.Y. Sept. 1, 2011).[6]

In addition to questioning the documentary evidence that the defendants have submitted, Quarless expresses skepticism as to the process that was used to select him for termination, arguing that there is no way to verify when or why he was added to the list of employees to be terminated. (Pl. Mem. at 9; Oral Arg. Tr. at 21.) It is true that the defendants cannot point to a specific individual who made the decision to terminate Quarless (Gasparini Dep. at 15-16), however, deposition testimony clearly indicates that the selection process involved Medbury and the other vice presidents. (Gasparini Dep. at 10; Medbury Dep. at 24.) The criteria that were used to select employees for termination were also clearly established through deposition testimony. Cabiness, Gasparini, and Medbury have all stated that the vice presidents targeted positions where other employees could assume the responsibilities of the positions that were eliminated. (Cabiness Aff. ¶ 10; Gasparini Dep. at 10; Medbury Dep. at 23-24.) These statements are entirely consistent with the circumstances of Quarless's termination and how BBG filled Quarless's position after terminating him. (Pl. R. 56.1 ¶¶ 21-22.)

At this stage of the burden-shifting test the presumption of retaliation has dissipated and Quarless bears the burden of demonstrating that retaliation was a cause of the adverse employment action.[7] Drawing all inferences in favor of Quarless, this Court concludes that at best the evidence indicates that BBG did not have a formal, static reduction in force plan that was generated solely by a comprehensive cost-saving formula, but rather utilized a more informal process that targeted middle management and weighed a variety of criteria including

---

[6] On appeal, the Second Circuit affirmed the lower court's decision, reasoning that BBG's "deteriorating financial condition" constituted a legitimate nondiscriminatory reason to terminate an employee. See Louis v. Brooklyn Botanic Garden, 487 F. App'x. 603 (2d Cir. 2012).
[7] Under Title VII, retaliation must be a "but for" cause of the termination. As discussed above, in § 1981 cases it is unclear if retaliation must be a "but for" cause or only a "motivating factor."

18

salary, the amount of severance, the amount of vacation time, and other benefits that BBG could save by a position's elimination. (See Gasparini Dep. at 10.)[8] Although the plaintiff would like the defendants to have gone through a formal process to select employees for termination, the law does not require such a process. An informal process, without more, is not evidence that the plan was a pretext for discrimination. See Zito v. Fried, Frank, Harris, Shriver & Jacobson, LLP, 869 F. Supp. 2d 378, 396 (S.D.N.Y. 2012) ("Plaintiff's complaints about the lack of "formal" [reduction in force] plans and Alcott's role as the sole decision-maker for the terminations in the New York Secretarial Services department are no more than disagreements with Defendant's process for planning the [reduction in force] and provide no evidence of discriminatory intent or pretext.").

Accordingly, this Court grants BBG's motion for summary judgment as to plaintiff's federal retaliation claims.

## C. NYSHRL and NYCHRL Retaliation Claims

Retaliation claims under the NYSHRL, like Title VII and § 1981 claims, are decided under the McDonnell Douglas burden shifting framework. Wilcox v. Cornell Univ., --- F. Supp. 2d ---, 2013 WL 6027922, at *4 (S.D.N.Y. 2013) (citing E.E.O.C. v. Bloomberg L.P., 967 F. Supp. 2d 816, 834 (S.D.N.Y. 2013)). Under the NYCHRL, a plaintiff "'must show that she took an action opposing her employer's discrimination and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action.'" Id. (quoting Mihalik v. Credit Abricole Cheuvreux N. Am., Inc., 715 F.3d 102, 112 (2d Cir. 2013)). Under the NYCHRL, "summary judgment is appropriate only if the plaintiff cannot show that

---

[8] At oral argument, Quarless raised another argument which was not briefed. He argued that his treatment after he was terminated from BBG indicates a retaliatory motive. (Oral Arg. Tr. at 10.) However, when asked by this Court whether Quarless's treatment after being terminated indicated that he was not terminated according to a reduction in force plan, Quarless's attorney responded, "Not the way that they treated him, the ever shifting answers to when he was thought about . . . ." (Oral Arg. Tr. at 11.) Thus, this argument also fails to demonstrate a material issue of fact.

retaliation played any part in the employer's decision." Mihalik, 715 F.3d at 116 (citing Melman v. Montefiore Med. Ctr., 946 N.Y.S. 2d 27, 30-31 (N.Y. App. Div. 2012)).  Both the NYSHRL and NYCHRL require a plaintiff to demonstrate some evidence that "'link[s] her complained-of [treatment] to a retaliatory motivation.'"  Wilcox, 2013 WL 6027922, at *4  (quoting Williams v. N.Y. City Hous. Auth., 872 N.Y.S.2d 27, 35 (N.Y. App. Div. 2009)).

For the reasons stated above, Quarless failed to demonstrate the necessary connection between his termination and defendants' alleged retaliatory motivation.  Defendants provided a non-retaliatory reason for Quarless's termination by presenting evidence that Quarless was terminated as a result of financial difficulties at BBG and because his position fit the criteria used to determine which positions could be eliminated.  Quarless's attempts to demonstrate a retaliatory motive by relying on the temporal proximity between his termination and his protected activity, as well as trying to call defendants' legitimate rationale into question fail to raise a genuine issue of material fact as to whether defendants' alleged retaliatory motivation was a but for, or even a motivating factor, in the decision to terminate his employment.

Accordingly, this Court grants BBG's motion for summary judgment as to plaintiff's state law retaliation claims.

## CONCLUSION

For the reasons stated, this Court grants defendants' motion for summary judgment on Quarless's Title VII, § 1981, and state law retaliation claims.  The Clerk of Court is directed to terminate all pending motions, enter judgment accordingly, and close the case.

SO ORDERED.

Dated: Brooklyn, New York
June 18, 2014

s/Carol Bagley Amon

Carol Bagley Amon
Chief United States District Judge

20

**Federal Rules of Appellate Procedure Form 6. Certificate of Compliance With Rule 32(a)**

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed.R. App. P.32(a)(7)(B) because:

   ☑ this brief contains  [12487]                    words, excluding the
   parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   ☐ this brief uses a monospaced typeface and contains   [state the number of]
   lines of text , excluding the pa rts of the bri ef
   exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the
   type style requirements of Fed. R. App. P. 32(a)(6) because:

   ☐ this brief has been prepared in a proportionally spaced typeface
   using [ state name and version of word processing program ] in
   [ state font size and name of type style], *or*

   ☐ this brief has been prepared in a monospaced typeface using
   [ state name and version of word processing program  ] with
   [ state number of characters per inch and name of type style ].

(s)   _____  Michael H. Zhu  _____

Attorney for  Plaintiff-Appellant Anthony C. Quarless
_____

Dated: October 15, 2014
_____

# ANTI-VIRUS CERTIFICATION FORM

*See* Second Circuit Local Rule 25(a)6

**CASE NAME:** Quarless v. BBG

**DOCKET NUMBER:** 2014-2590

I, Michael H. Zhu                    , certify that I have scanned for viruses in the PDF version of the attached document that was submitted in this case as an email attachment to:

☐ <agencycases@ca2.uscourts.gov>
☐ <criminalcases@ca2.uscourts.gov>
☑ <civilcases@ca2.uscourts.gov>
☐ <newcases@ca2.uscourts.gov>
☐ <prosecases@ca2.uscourts.gov>

and that no viruses were detected.

**NAME OF ANTI-VIRUS DETECTOR USED:** AVG

**VERISION AND/OR THE ANTI-VIRUS SIGNATURE FILES:**

Michael H. Zhu

Dated: October 15, 2014